IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-32810 (CML)** |
| **Polaris Operating, LLC**, *et al.*, | § | |
| | § | **Chapter 11** |
| Debtors.[1] | § | |
| | § | **(Jointly Administered)** |

**DEBTORS' MOTION FOR (A) ENTRY OF AN ORDER (I) APPROVING BIDDING
PROCEDURES; (II) AUTHORIZING TRANSFER(S) OUTSIDE THE ORDINARY
COURSE OF BUSINESS; (III) SCHEDULING BID DEADLINE, AUCTION DATE, AND
SALE HEARING DATE; (IV) APPROVING FORM OF NOTICE THEREOF; AND (B)
ENTRY OF AN ORDER AFTER THE SALE HEARING (I) AUTHORIZING AND
APPROVING THE DEBTORS TO SELL THE WGU ENERGY, LLC EQUITY ASSET;
AND (II) GRANTING RELATED RELIEF**

**RELIEF HAS BEEN REQUESTED NOT LATER THAN 5:00 P.M. (PREVAILING CENTRAL
TIME) ON AUGUST 15, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
CONSIDERATION ON AN EXPEDITED BASIS IS NOT WARRANTED, YOU MUST APPEAR
AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE
THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE
COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF
REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST __, 2024 AT __:_0_.M.
(PREVAILING CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE,
HOUSTON, TX 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND
VIDEO CONNECTION.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective
Employer Identification Numbers, are as follows: CCCB Energy Partners, LLC (5918); Polaris Operating, LLC
(9852); NAP I, LLC (6767); and Cottonwood Gas Gathering, LLC (8983).  The Debtors' service address is: 5944
Luther Lane, Suite 400, Dallas, TX 75225.

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Polaris Operating, LLC, *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this *Debtors' Motion For (A) Entry Of An Order (I) Approving Bidding Procedures; (II) Authorizing Transfer(s) Outside The Ordinary Course Of Business; (III) Scheduling Bid Deadline, Auction Date, And Sale Hearing Date; (IV) Approving Form Of Notice Thereof; And (B) Entry Of An Order After The Sale Hearing (I) Authorizing And Approving The Debtors To Sell The WGU Energy, LLC Equity Asset; And (II) Granting Related Relief* (the "Sale Motion"), and in support hereof, respectfully state as follows:

## I. PRELIMINARY STATEMENT

1.      By this motion the Debtors seek entry of two orders; a Bidding Procedures Order and a Sale Order (each defined below).

2.      At the initial hearing (the "Bidding Procedures Hearing"), the Debtors seek entry of an order (the "Bidding Procedures Order"), substantially in the form filed herewith:

> (i) approving bidding procedures, (ii) scheduling a bid deadline, auction date, and sale hearing date; (iii) approving form and manner of notice thereof; and (vi) granting related relief.

3.      At the final hearing (the "Sale Hearing") the Debtors seek entry of an order (the "Sale Order"):

(i) authorizing the Debtors to sell the equity interests of WGU Energy, LLC (the "Assets" or "Purchased Assets")[2], to the Stalking Horse Purchaser or Successful Bidder[3] free and clear of liens, claims and encumbrances; and, (ii) granting related relief.

## II.  JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended and modified, the "Bankruptcy Code"), Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 4002-1 and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Procedures").

## III.  BACKGROUND

### A.    In General

1.      On July 28, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  The Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered by the Court under Case No. 23-32810.

---

[2] As more fully set forth herein, to avoid the various equity transfer restrictions set forth in the WGU Agreement (defined below), the Debtors intend on creating a Non-debtor affiliate, transferring CCCB Energy Partners, LLC's 30.357% equity ownership to this Non-debtor affiliate, and then selling 100% of the equity of the Non-debtor affiliate.

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Bidding Procedures Order.

6.    Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. No official committee has been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or examiner.

### Corporate Overview

7.    Prior to entering into bankruptcy, the Debtors were privately held independent oil and gas companies focused on acquiring, optimizing and developing conventional oil and gas properties with re-development and new development opportunities. The Debtors' core area of operations is in the Texas Panhandle, specifically in Moore, Potter and Roberts counties, where they own and operate hundreds of shallow oil and gas wells with a significant amount of infrastructure including gathering systems, power lines, disposal wells, workover rigs and water trucks. The Debtors' panhandle assets were comprised of working interests in two formations along with their corresponding midstream infrastructure, namely, the Red Cave Formation (the "Masterson Assets") and the Granite Wash Formation (the "Mesa Vista Assets").  Further, the Debtors own an equity interest in a waterflood oil and gas project located approximately thirty (30) miles south of Oklahoma City, Oklahoma (hereafter, the "WGU Asset" or the "Purchased Assets").

8.    The Debtors' operations were divided amongst the parent, CCCB Energy Partners, LLC (sometimes referred to as, "CCCB"), and it's three wholly-owned subsidiaries: Polaris Operating, LLC ("Polaris"), NAP I, LLC ("NAP I"), and Cottonwood Gas Gathering, LLC ("Cottonwood").  While CCCB and NAP I own various interests in the Masterson Assets and Mesa Vista Assets, Cottonwood serves as the marketing and contract arm to monetize hydrocarbons produced from the Masterson Assets.  Polaris, an independent operator licensed

and bonded with the Texas Railroad Commission, serves as the operating entity for all of the Debtors' operations.

### The WGU Asset

9.      The WGU Asset is more specifically defined as CCCB Energy Partners, LLC's non-controlling, non-operated ownership of a 30.357% equity interest in WGU Energy, LLC. WGU Energy, LLC ("WGU"), in turn, is an Oklahoma limited liability company owning and operating significant oil and gas mineral interests in the West Goldsby Osborn Unit in McClain County, Oklahoma.

10.      While CCCB is the largest equity owner of the twenty-three (23) total members, CCCB does not maintain an active role but rather participates alongside the other equity interest owners in a limited, passive capacity.  Notably, as discussed in more detail below, all members and membership interests are subject to certain transfer restrictions and limitations, as more fully set forth in the *First Amended and Restated Operating Agreement of WGU Energy, LLC* (hereafter, the "WGU Agreement").[4]

### B.      The Mesa Vista and Masterson Sales

11.      On November 16, 2023, the Debtors filed their *Emergency Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Stalking Horse Protections; (IV) Scheduling Bid Deadline, Auction Date, and Sale Hearing Date; (IV) Approving Form of Notice Thereof; (B) Entry of an Order After the Sale Hearing (I) Authorizing the Debtors to Sell Their Assets; and (II) Authorizing the Debtors to Assume and Assign Certain Executory Contract and Unexpired Leases; and (C) Granting Related Relief*  [Docket No. 211].

---

[4] Due to certain confidentiality restrictions, the Debtors are not attaching the WGU Agreement as an exhibit to this Motion.  Parties wishing to review the WGU Agreement may contact the undersigned, and upon execution of a confidentiality and non-disclosure agreement with the Debtors, may be granted viewing access.

The Sale Motion was subsequently approved and an Order was entered by the Court authorizing the Debtors to, among other things, conduct an auction of the Debtors' Mesa Vista Assets and Masterson Assets and to sell these assets free and clear of any liens, claims or encumbrances [Docket No. 222].

12.     On December 15, 2023, the Debtors conducted an auction to determine the highest bidder(s) for the purchase of the Masterson Assets and the Mesa Vista Assets pursuant to the Court's prior bid procedures order.  Upon the conclusion of the auction, the Debtors, exercising their business judgment, selected Mesa Vista Operating ("MVO") as the successful bidder for the Mesa Vista Assts and Contango Oil and Gas, LLC ("Contango") as the successful bidder for the Masterson Assets, both pursuant to the terms as stated on the record at the auction.

13.     The sale of the Mesa Vista Assets to MVO was subsequently approved by the Court at the December 20, 2023 sale hearing (the "First Sale Hearing").  Thereafter, on or about February 2, 2024, the Court entered its *Revised Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of the Debtors' Mesa Vista Assets Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Mesa Vista Sale Order") [Docket No. 286], authorizing the Debtors' sale of the Mesa Vista Assets to MVO.  The Mesa Vista Sale closed in February 2024, and all subsequent regulatory issues have been resolved.

14.     The sale of the Masterson Assets to Contango was also approved by the Court at the First Sale Hearing.  Thereafter, the Court entered its *Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of the Debtors' Masterson Assets Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims,*

*Encumbrances and Interests (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "First Masterson Sale Order") [Docket No. 252], authorizing the Debtors' sale of the Masterson Assets to Contango[5].

**C.     Proposed Sale Process for the WGU Asset**

15.     To maximize value to the Debtors' estates, the Debtors intend to market and sell the WGU Asset in accordance with the bidding procedures and auction process as more fully set forth in the proposed order (the "Bidding Procedures Order") and accompanying bidding procedures (hereafter, "Bidding Procedures"), attached hereto and incorporated herein by reference.  The Debtors request that they are authorized, but not directed, to select a bidder to act as a stalking horse (a "Stalking Horse Purchaser"), and to enter into an asset purchase agreement with such Stalking Horse Purchaser (a "Stalking Horse Agreement") for the sale of the WGU Asset.

16.     The Debtors may designate a Stalking Horse Purchaser for the WGU Asset by September 9, 2024 (the "Stalking Horse Designation Deadline").  If a Stalking Horse Purchaser is selected by the Debtors, the Debtors will file and serve a notice (the "Stalking Horse Selection Notice") as soon as reasonably practicable after the Stalking Horse Designation Deadline that: (i) contains information regarding (a) the Stalking Horse Purchaser, (b) its bid for the applicable Purchased Assets (a "Stalking Horse Bid"), and (c) any bid protections that may be payable to the Stalking Horse Purchaser ("Stalking Horse Protections") pursuant to the Bidding Procedures; and (ii) attaches the proposed Stalking Horse Agreement.  Thereafter, all parties in interest will have ten (10) days from service of the Stalking Horse Selection Notice (the "Stalking Horse

---

[5] The parties were unable to consummate the transaction as originally authorized by the Court, however, are still working cooperatively in an attempt to enter into a modified transaction, subject to this Court's approval.

Objection Deadline") to file objections (each, a "Stalking Horse Objection") to the designation of the Stalking Horse Purchaser or any of the terms of the Stalking Horse Agreement, including to any of the proposed Stalking Horse Protections.

17.     With respect to any Stalking Horse Selection Notice, if a timely Stalking Horse Objection is filed and served in accordance with the Bidding Procedures Order, the proposed designation of the Stalking Horse Purchaser and the Stalking Horse Protections under such Stalking Horse Agreement will not be deemed approved until either the Stalking Horse Objection is resolved by agreement of the objecting party and the Debtors (in consultation with Vista Bank) or by order of the Court.  If no timely Stalking Horse Objection is filed and served with respect to a Stalking Horse Selection Notice, the Stalking Horse Purchaser shall be deemed approved and the Stalking Horse Protections contemplated by such Stalking Horse Bid (as disclosed in the Stalking Horse Selection Notice) shall be deemed approved without further order of the Court upon the expiration of the Stalking Horse Objection Deadline.

18.     In order to ensure that the Debtors' estates realize the maximum value for the WGU Asset, the Debtors intend to "test" the marketplace in accordance with the Bidding Procedures. Specifically, the Debtors have employed SP Securities, LLC ("SPS") as an investment banker to market the WGU Asset in accordance with the Bidding Procedures and obtain the highest and best offer for a prompt sale.   Thus, any Stalking Horse Bid contained in a Stalking Horse Agreement will be subject to higher or better bids in accordance with the Bidding Procedures.

19.     While the Debtors could potentially market and attempt to sell the WGU Asset as is, to do so would subject any such sale to the onerous transfer restrictions set forth in the WGU Agreement, specifically including but not limited to: (i) existing equity members' right of first

refusal to match any third-party offer to purchase; and, (ii) an inability to transfer the membership voting right(s) to any non-existing equity member.  Such limitations and restrictions would materially alter the viability of marketing and sale process and likely correspond with the Debtors receiving less value in a sale than they could otherwise obtain, absent such restrictions. To circumnavigate such restrictions and maximize the value they may otherwise garner in the sale of the WGU Asset, immediately prior to consummating the sale, the Debtors intend to:

    a. First, create a Non-debtor Affiliate (entirely owned and controlled by CCCB Energy Partners, LLC);

    b. Second, transfer CCCB Energy Partners, LLC's 30.357% equity ownership in WGU Energy, LLC to said Non-debtor Affiliate; and then,

    c. At closing, transfer CCCB Energy Partners, LLC's 100% equity ownership of the Non-debtor Affiliate to the Stalking Horse Purchaser or Winning Bidder, as applicable.

20.    Such a three-step process would utilize the lenient "affiliate transfer" provision(s) in the WGU Agreement and avoid triggering the burdensome transfer restriction(s) and limitation(s) contained therein.[6]

### IV.  **RELIEF REQUESTED**

21.    By this Sale Motion, and after notice and a Bidding Procedures Hearing, the Debtors seek entry of a Bidding Procedures Order: (i) approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order, in connection with the sale of the Debtors' WGU Asset; (ii) approving the Stalking Horse Protection(s) payable to a Stalking Horse Purchaser, if any; (iv) scheduling bid deadline, auction date, and Sale Hearing date as set

---

[6] In light of CCCB Energy Partners, LLC status as a debtor in these Chapter 11 Cases with both assets and liabilities completely distinct from the WGU Asset, a sale and assignment of the equity of CCCB Energy Partners, LLC is not feasible at this time.

forth below; and (v) approving the form of notice thereof. The Bidding Procedures contemplate the following schedule, subject to Court approval and modification as necessary, in connection with conducting a sale of the Debtors' WGU Asset, as applicable:

| Event | Date |
|---|---|
| Stalking Horse Designation Deadline | September 9, 2024 as the date by which the Debtors shall have selected a Stalking Horse Purchaser for the Assets, and file a Stalking Horse Selection Notice; *provided*, *however*, the Debtors may extend the Stalking Horse Designation Deadline with the express consent of Vista Bank. |
| Stalking Horse Objection Deadline | The last date by which parties in interest must file and serve a Stalking Horse Objection in the event the Debtors file a Stalking Horse Selection Notice shall be ten (10) days after service of the applicable Stalking Horse Selection Notice. |
| Sale Objection Deadline | September 12, 2024 at 5:00 p.m. (prevailing Central Time) as the last date by which any party in interest must file and serve objections relating to the relief requested in this Sale Motion, as it relates to the sale of the Debtors' Assets to a Stalking Horse Purchaser or other Successful Bidder. |
| Bid Deadline | September 16, 2024 at 5:00 p.m. (prevailing Central Time) as the last date by which any Potential Bidder may deliver its bid for the WGU Asset. |
| Auction Date | September 19, 2024 at 10:00 a.m. (prevailing Central Time) as the date and time that an auction (the "Auction") for the WGU Asset, if one is needed, will be held by the Debtors. |
| Auction Objection Deadline | September 23, 2024 at 5:00 p.m. (prevailing Central Time). |
| Sale Hearing Date | Subject to Court availability and approval of the Sale Hearing date in the Bidding Procedures Order, the Debtors will seek entry of a Sale Order from the Court at the Sale Hearing to begin on September 26, 2024, to approve and authorize the sale to the Stalking Horse Purchaser or other Successful Bidder on the terms and conditions memorialized in the applicable Asset Purchase Agreement. |

22.    In addition, the Debtors seek, at the conclusion of the Sale Hearing, entry of a Sale Order: (a) authorizing the sale of the Debtors' WGU Asset to the respective Stalking Horse Purchaser or other Successful Bidder, with such sale being free and clear of all liens, claims, and

encumbrances, and with such Stalking Horse Purchaser or Successful Bidder being deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code; (b) authorizing the Debtors to engage in non-ordinary course transactions to effectuate the sale; and, (b) granting certain related relief.  More specifically, at the conclusion of the Sale Hearing, the Debtors seek entry of a Sale Order that authorizes:

    a.  First, the creation of a Non-debtor Affiliate (wholly owned and controlled by CCCB Energy Partners, LLC);

    b.  Second, the transfer of CCCB Energy Partners, LLC's 30.357% equity interest in WGU Energy, LLC to the newly formed Non-debtor Affiliate, free and clear of any liens, claims and encumbrances; and,

    c.  Third, a sale of CCCB Energy Partners, LLC's 100% equity interest in the newly formed Non-debtor Affiliate (owning a 30.357% equity interest in WGU Energy, LLC), free and clear of any liens, claims and encumbrances.

## A.    **Proposed Bidding Procedures**

23.    Pursuant to this Sale Motion, the Debtors seek to sell the WGU Asset.  Pursuant to Bankruptcy Rule 6004(f), sales of property outside the ordinary course of business may be by private sale or auction.  The Debtors believe that good cause exists to sell the WGU Asset to a Stalking Horse Purchaser (if any), or if necessary, to another Successful Bidder after conducting an Auction.  An Auction conducted substantially in accordance with the proposed Bidding Procedures will enable the Debtors to obtain the highest and best offer(s) for the WGU Asset and thereby maximize the value for the benefit of the Debtors' estates and creditors.

24.    The Debtors submit that the Bidding Procedures attached to the proposed Bidding Procedures Order will afford interested parties a reasonable opportunity to evaluate whether to

submit a bid for the WGU Asset. The Bidding Procedures ensure that the Debtors will successfully pursue their marketing and sale process designed to maximize value for the estates. Accordingly, the Debtors request that the Court enter the proposed Bidding Procedures Order submitted herewith and approve the Bidding Procedures.

**B.**    **Approval of Sale Notice Procedures**

25.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the WGU Asset, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections thereto. The proposed sale notice (the "Sale Notice") attached hereto as **Exhibit A** contains the type of information required under Bankruptcy Rule 2002(c), and also includes information on the Bidding Procedures. The Debtors' proposed Sale Notice procedures are as follows:

(i)    The Debtors shall serve the Sale Notice within five (5) business days after the entry of the Bidding Procedures Order, upon all parties on the Debtors' Master Service List, and, for the avoidance of doubt: (a) counsel to Vista Bank; (b) WGU Energy, LLC's management and all other equity interest holders; (c) the United States Trustee for the Southern District of Texas; (d) all other parties known to the Debtors who have or may have asserted liens, claims, encumbrances, or interests in or against the WGU Asset; (e) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (f) all of the Debtors' creditors as required by Bankruptcy Rule 2002(a)(2); (g) federal, state, and local taxing authorities; (h); all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (i) all parties known to have expressed an interest in a transaction with respect to all or a part of the WGU Asset.

(ii)    Any objections to the relief requested in this Sale Motion as relates to the sale of the WGU Asset to a Stalking Horse Purchaser or other Successful Bidder (a "Sale Objection") must: (a) set forth in writing and describe with specificity the factual and legal basis for the Sale Objection; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; and (c) be filed with the Clerk of the Court no later than September 12, 2024 at 5:00 p.m. (prevailing Central Time) or such other date as determined by the Court and set forth in the Bidding Procedures Order (the "Sale Objection Deadline").

(iii)    The failure of any person or entity to file a Sale Objection by the Sale Objection Deadline shall be deemed consent to the sale of the WGU Asset to the Stalking Horse Purchaser or other Successful Bidder. Further, the failure to file a Sale

Objection by the Sale Objection Deadline shall be a bar to the assertion of an objection, at the Sale Hearing or thereafter, to (a) the sale of the WGU Asset free and clear of any liens, claims, and encumbrances; and (b) the Debtors' consummation and performance of a Stalking Horse Agreement or other Asset Purchase Agreement, as applicable.

(iv)     If a Sale Objection is timely filed by the Sale Objection Deadline and the relevant parties are unable to resolve the Sale Objection prior to the commencement of the Sale Hearing, such Sale Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court.

26.     The Debtors submit that the Sale Notice to be provided and the method of service proposed herein constitute good, proper and adequate notice of the sale of the WGU Asset and the proceedings to be had with respect thereto.  This information will enable interested parties to participate in the Auction and Sale Hearing if they choose.  Accordingly, the Debtors request that the Court approve the form and content of, and procedures related to, the Debtors' proposed Sale Notice.

## V.  BASIS FOR RELIEF REQUESTED

### A.     The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Purchased Assets Given the Financial Exigencies Facing the Debtors

27.     The Bidding Procedures proposed herein are designed to maximize the value received for the WGU Asset by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and expend the time, energy and resources necessary to submit competing bids, taking into account the financial exigencies facing the Debtors.  The Debtors' believe that the Bidding Procedures, as set forth herein, provide Potential Bidders with sufficient notice and opportunity to complete due diligence and acquire the information necessary to submit a timely and informed bid.  The Debtors believe that the period between the filing of this Sale Motion and the Bid Deadline provides a fair and reasonable means for maximizing the return from a sale of the WGU Asset.

28.     At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the completion of a sale of the WGU Asset.  The Bidding Procedures and Auction process will ensure that the consideration ultimately paid for the Purchased Assets will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and there are sound business reasons to approve the Bidding Procedures.

**B.      Stalking Horse Protections for Stalking Horse Purchaser are Appropriate**

29.     If a Stalking Horse Purchaser is ultimately selected for the WGU Asset, the Debtors respectfully submit that any Stalking Horse Protections set forth in a Stalking Horse Agreement will be fair and reasonable under the exigent circumstances of the Chapter 11 Cases and designed to maximize value in a competitive bidding process.

30.     If and to the extent a Stalking Horse Purchaser is selected, all parties in interest will be sufficiently apprised of any Stalking Horse Protections set forth in the applicable Stalking Horse Agreement, if and when a Stalking Horse Selection Notice is filed by the Debtors.  By establishing a Stalking Horse Objection Deadline and permitting all parties in interest to file Stalking Horse Objections, if needed, the rights of all parties to object to approval of Stalking Horse Protections are preserved.  Accordingly, as set forth herein, the Debtors submit that the Stalking Horse Protections contemplated in the Bidding Procedures should be approved by the Court.

31.     Historically, bankruptcy courts have approved bidding incentives, including breakup fees awarded to an initial bidder, or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  *See, e.g. In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the

risks it is undertaking"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a breakup fee); *Asarco, Inc. v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 601-03 n. 9 (5th Cir. 2011).

32.      The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 534–35 (3d Cir. 1999).  Finding no "compelling justification" for treating an application for breakup fees and expenses under section 503(b) any differently from other application for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowance and payment of breakup fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id*. at 535.

33.      In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, thereby justifying administrative expense status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id*. at 537.  Second, where the

availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

34.     Both of those circumstances exist here because the inducement of Stalking Horse Protections consisting of a Breakup Fee and Expense Reimbursement (each as defined in the Bidding Procedures) will be critical in persuading any Stalking Horse Purchaser to: (i) expend the time and resources associated with conducting due diligence regarding the Debtors' businesses and the WGU Asset, (ii) make an initial offer (which will serve as a "floor" for other competing bidders in connection with the Bidding Procedures), and (iii) negotiate and enter into a Stalking Horse Agreement.

35.     Under the "administrative expense" standard, as well as the "sound business judgment" standard followed in other jurisdictions and the Fifth Circuit, the Bidding Procedures proposed by the Debtors, including the Stalking Horse Protections, should be approved as fair and reasonable.   Here, the proposed Stalking Horse Protections, which remain subject to negotiation by the Debtors in any applicable Stalking Horse Agreement, will consist of a reasonable Breakup Fee plus Expense Reimbursement for actual, reasonable out-of-pocket expenses.

36.     The Debtors respectfully submit that the limitations on Stalking Horse Protections provided under any Stalking Horse Agreement are, and will be demonstrated to be, reasonable under the exigent circumstances of these Chapter 11 Cases and comport with the general range of bidding protections approved by bankruptcy courts in Texas.   *See, e.g., In re Alta Mesa Resources, Inc., et al.*, No. 19-35133 (MI) (Bankr. S.D. Tex. Jan. 14, 2020) (3% breakup fee and

expense reimbursement); *In re Ignite Restaurant Group, Inc., et al.* No. 17-33550 (DRJ) (Bankr. S.D. Tex. June 22, 2017) (3% breakup fee); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (3% breakup fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (3% breakup fee and 1% expense reimbursement). Specifically, the Debtors submit that the Stalking Horse Protections: (i) are reasonable in light of the Debtors' potential value of the Purchased Assets and the size of a transaction that would be contemplated by a Stalking Horse Agreement; and (ii) are reasonably related to the fees and expenses incurred by a Stalking Horse Purchaser in relation to its efforts to enter into a Stalking Horse Agreement with the Debtors.

37.    The Debtors further believe the proposed Stalking Horse Protections would confer actual benefits upon their bankruptcy estates in the event a Stalking Horse Purchaser is ultimately selected because they are reasonably calculated to incentivize a potential Stalking Horse Purchaser to set the bidding "floor" and induce competitive bidding that may produce higher and better offers for the Purchased Assets.  Accordingly, the Debtors respectfully request that the Court approve the Stalking Horse Protections in the Bidding Procedures Order.

**C.    A Stalking Horse Purchaser or Successful Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)**

38.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith …." 11 U.S.C. § 363(m).  Under this section, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re*

*Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007).

39.     As discussed above, the sale process and the Bidding Procedures contemplated as a part thereof (if and in whatever form approved by the Court at the Bidding Procedures Hearing), have been designed to create a fair, open and level playing field.  In furtherance of this effort, any transaction reflected in a Stalking Horse Agreement with a Stalking Horse Purchaser will be negotiated by the parties at arm's length and in good faith, and any Stalking Horse Purchaser and its affiliates will not have any relationship to the Debtors that has not been fully disclosed to the Court.

40.     Moreover, to the extent a Stalking Horse Purchaser is selected but another Successful Bidder prevails at the Auction, if any, the Debtors will demonstrate at the Sale Hearing that the final Asset Purchase Agreement with the Successful Bidder was negotiated at arm's-length, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Stalking Horse Purchaser or other Successful Bidder submitting the Successful Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.  *See, e.g., In re United Press Int'l, Inc.*, No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y.  May 18, 1992).   The Debtors maintain that providing the Stalking Horse Purchaser or other Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Purchased Assets.

**D.     The Sale of the Purchased Assets Is Authorized Under Bankruptcy Code Section 363(b)**

41.     At the conclusion of the Sale Hearing, the Debtors request that the Court enter the Sale Order(s) approving the sale of the Purchased Assets to the Stalking Horse Purchaser or

Successful Bidder, as applicable.[7]  The Debtors submit that the sale of the Purchased Assets is in the best interest of the Debtors' estates and their creditors.

42.    Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by "some articulated business justification," as established by the Second Circuit in *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2nd Cir. 1983), which decision has been adopted in the Fifth Circuit.  *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986); *see also, Fulton State Bank* v. *Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *In re San Jacinto Glass Industries, Inc.,* 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988); *In re Condere Corp.,* 228 B.R. 615, 628-69 (Bankr. S.D. Miss. 1998).

43.    The business judgment rule shields a debtor's management from judicial second-guessing.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business

---

[7] This portion of the relief is requested to be entered after the Sale Hearing in the form of the Sale Order.  The Debtors hereby reserve the right to file supplemental pleadings in support of its request for entry of the Sale Order.

judgment rule, then the transaction in question should be approved under section 363(b)(1) of Bankruptcy Code.

44.     When applying the business judgment standard, courts show great deference to a debtor's business decisions. *See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687, at *8-9 (N.D. Ill. Sep. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion."); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a § 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

45.     The Debtors respectfully submit that their proposed sale of the WGU Asset outside the ordinary course of business fits squarely within the parameters of the sound business judgment test, taking into consideration that the Debtors operate in a difficult business segment and related issues facing the Debtors' assets. The Debtors have articulated a sound business purpose for any transaction emanating from the sale or Auction process, including as a baseline, and the transaction contemplated by a potential Stalking Horse Agreement, if applicable. As set forth above, the Debtors, in the business judgment of their Chief Restructuring Officer, have determined that it is in the best interest of the estates to consummate a sale of the WGU Asset. In order to monetize the asset for distribution to creditors, it is critical that the Debtors are permitted to consummate a sale of the WGU Asset pursuant to this Sale Motion and any Sale Order entered by the Court.

46.     The Debtors believe that any purchase price obtained pursuant to a Stalking Horse Agreement or other Asset Purchase Agreement during the marketing process will be fair and reasonable.  Thus, if a Stalking Horse Purchaser is selected, the Debtors will be prepared to close a transaction with the Stalking Horse Purchaser even if no other qualified/legitimate bid is submitted by a competing bidder.  However, the fairness and reasonableness of the consideration ultimately paid for the WGU Asset by the applicable Stalking Horse Purchaser, or other Successful Bidder, will be conclusively demonstrated by the exposure of the opportunity to the marketplace in connection with the Bidding Procedures. Accordingly, the Debtors submit that any sale presented in connection with this Sale Motion is warranted and appropriate under section 363(b) of the Bankruptcy Code, and the Sale Order should be entered by the Court.

**E.      The Sale of the WGU Asset Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Section 363(f)**

47.     The Debtors respectfully request that the sale(s) and transfer(s) of the WGU Asset be approved free and clear of all liens, claims, encumbrances and other interests (other than those specifically assumed by a Stalking Horse Purchaser or other Successful Bidder), with all such interests attaching to the net sale proceeds of the WGU Asset to the extent applicable.  Such relief is consistent with the provisions of section 363(f) of the Bankruptcy Code in these types of cases.

48.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

21

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

49.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets free and clear of the interests.  *In re Nature Leisure Times, LLC*, 2007 WL 4554276, *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

50.     The Debtors believe that one or more of the tests under section 363(f) will be satisfied with respect to the transfer(s) of the WGU Asset pursuant to a Sale Order.  In particular, the Debtors believe that Vista Bank will consent to the transaction(s) presented for approval at the Sale Hearing. The Debtors further believe section 363(f)(5) will be satisfied.  Based on the above, the requirements of section 363(f) of the Bankruptcy Code can be satisfied, and the sale(s) of the WGU Asset free and clear of all liens, claims, encumbrances and other interests is appropriate.

**F.      The Form, Manner and Extent of Notice of the Sale Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

51.     The Debtors will serve the Bidding Procedures and Sale Notice in accordance with the Bidding Procedures Order and will serve this Sale Motion as set forth below.  The

notice of the proposed sale to be provided by the Debtors as set forth herein and in the Bidding Procedures Order sufficiently describes the terms and conditions of the proposed sale.

52.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Sale Motion and the related notices satisfy all such requirements:

   a.   <u>Bankruptcy Code Section 363</u> – Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing."  Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors have been, and will be, provided notice of the salient details regarding this Sale Motion and the Sale Hearing.  Accordingly, notice is sufficient under Bankruptcy Code section 363.

   b.   <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." FED. R. BANKR. P. 2002.  As set forth above, the notice of this Sale Motion that has been, and will be, provided by the Debtors satisfies each of these requirements.

   c.   <u>Bankruptcy Rule 6004</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6004(c) requires service of a motion for authority to sell property free and clear of liens and other interests on parties who have liens or other interests in the property to be sold.  A copy of this Sale Motion will be served on parties claiming liens or interests in the Debtors' Assets.

   d.   <u>Procedural Due Process</u> – The notice of this Sale Motion that is being provided as described herein is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion, the sale, the Bidding Procedures and the other relief requested herein.

53.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed sale and the Bidding Procedures, as applicable, is

reasonable and appropriate and constitutes good and adequate notice of the sale of the WGU Asset and the procedures and proceedings related thereto and therefore should be approved by this Court.

### G. The Stay of the Sale Order Should be Waived

54.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  The Debtors request that any Sale Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived. To require the Debtors to delay the closing and the resulting reductions of the Debtors' secured obligations and related adequate protection obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources.

## VI. PRAYER

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order after the Bidding Procedures Hearing (a) authorizing the Debtors to implement the Bidding Procedures and conduct a marketing and sale process under section 363 of the Bankruptcy Code, and (b) approving the Stalking Horse Protections payable to a Stalking Horse Purchaser, if any; (ii) enter the Sale Order(s) (to be filed as a proposed order at a later date) after the Sale Hearing (a) authorizing the Debtors to sell the WGU Asset to a Stalking Horse Purchaser or Successful Bidder free and clear of all liens, claims, encumbrances and other interests, and (b) authorizing the Debtors to take any further action necessary to consummate the sale; and, (iii) grant such other and further relief as the Court may deem just and proper.

Respectfully submitted on the 26th day of July, 2024.

**OKIN ADAMS BARTLETT CURRY LLP**

By:   /s/ *Christopher Adams*
      Christopher Adams
      Texas Bar No. 24009857
      Email: cadams@okinadams.com
      John Thomas Oldham
      Texas Bar No. 24075429
      Email: joldham@okinadams.com
      1113 Vine St., Suite 240
      Houston, Texas 77002
      Tel: 713.228.4100
      Fax: 346.247.7158

**ATTORNEYS FOR THE DEBTORS**

## CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(i)

In accordance with Local Bankruptcy Rule 9013-1(i), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

By:   /s/ *Christopher Adams*
      Christopher Adams

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2024 a true and correct copy of the foregoing Motion was served via this Court's CM/ECF notification system to those parties registered for service upon filing of the same.

By:   /s/ *Christopher Adams*
      Christopher Adams