**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

In re:

POLARIS OPERATING, LLC, *et al.*,

Debtors.[1]

Chapter 11

Case No. 23-32810

(Jointly Administered)

**OBJECTION OF BLACK OAK PARTNERS LLC TO DEBTORS'
MOTION FOR (A) ENTRY OF AN ORDER (I) APPROVING BIDDING
PROCEDURES; (II) AUTHORIZING TRANSFER(S) OUTSIDE THE
ORDINARY COURSE OF BUSINESS; (III) SCHEDULING BID DEADLINE,
AUCTION DATE, AND SALE HEARING DATE; (IV) APPROVING FORM OF
NOTICE THEREOF; AND (B) ENTRY OF AN ORDER AFTER THE SALE
HEARING (I) AUTHORIZING AND APPROVING THE DEBTORS TO SELL THE
WGU ENERGY, LLC EQUITY ASSET; AND (II) GRANTING RELATED RELIEF**
**[Related Docket No. 383]**

    Black Oak Partners LLC ("Black Oak"), hereby files this Objection (the "Objection") to

the *Debtor's Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Authorizing*

*Transfer(s) Outside the Ordinary Course of Business; (III) Scheduling Bid Deadline, Auction*

*Date, and Sale Hearing Date; (IV) Approving Form of Notice Thereof; and (B) Entry of an Order*

*After the Sale Hearing (I) Authorizing and Approving the Debtors to Sell the WGU Energy, LLC*

*Equity Asset; and (II) Granting Related Relief* [Doc. No. 383] (the "Sale Motion") filed by the

Debtors.  In support of its Objection, Black Oak would show the Court as follows:

## I.      INTRODUCTION

    1.      The Sale Motion seeks to establish procedures and obtain approval for the sale of

membership interests in WGU Energy, LLC ("WGU"), which membership interests are owned by

---

[1] The debtors and debtors-in-possession in these chapter 11 cases, along with the last four digits
of their respective Employer Identification Numbers, are as follows:  CCCB Energy Partners, LLC
(5918), Polaris Operating, LLC (9852), NAP I, LLC (6767), and Cottonwood Gas Gathering, LLC
(8983).  The debtors' service address is 5944 Luther Lane, Suite 400, Dallas, TX 75225.

Debtor CCCB Energy Partners, LLC ("CCCB").  WGU owns a waterflood oil and gas project located in Oklahoma.  Black Oak is also a member of WGU.

2.      Black Oak does not generally object to the Debtor's sale of its interest in WGU. However, such sale must be in accordance with the terms and conditions of WGU's governing documents, which set out the transfer requirements for all members.  CCCB in executing the operating agreement expressly agreed to the transfer requirements.  By the Sale Motion, though, the Debtors propose to implement a procedure designed to attempt to evade those agreed-upon transfer requirements.  Such efforts are wholly inequitable.  Also, those efforts will not succeed because the terms of WGU's governing documents prohibit indirect transfers of the kind being proposed by the Debtors.  The Debtors' scheme will only result in a void transfer and the disqualification of CCCB and any purported transferee from membership. The Court should not approve the flawed procedures proposed by the Sale Motion.

3.      Further, WGU is still in the development stage, and such development is extremely capital intensive.  Capital calls to WGU's members have been initiated and are expected to continue.  Any sale of CCCB's ownership interest in WGU must be subject to such any outstanding or future capital call obligations.

## II.     RELEVANT FACTUAL BACKGROUND

4.      On July 28, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

5.      Debtor CCCB is a member of WGU.  *See* Doc. No. 138 at Pg. 4.  CCCB's equity interest in WGU is defined in the Sale Motion as the "WGU Asset" or the "Purchased Assets."

6.      Black Oak is also a member of WGU.

7.     The membership rights of CCCB and Black Oak in WGU, together with all other members, are governed by that certain First Amended and Restated Operating Agreement of WGU Energy, LLC, effective February 1, 2022 (the "WGU Operating Agreement").  A copy of the Operating Agreement is attached hereto as **Exhibit 1**.

8.     The Operating Agreement contains certain conditions, requirements, and restrictions concerning a member's ability to transfer membership units in WGU.  *See* Operating Agreement, Articles 7 and 8.

9.     The Operating Agreement also contains provisions governing members' ongoing obligations for capital contributions and capital calls.  *See* Operating Agreement, Article 2.

10.    On July 26, 2024, the Debtors filed the Sale Motion.

11.    The Sale Motion seeks to establish a sales process for the WGU Asset.

### III.    ARGUMENT AND AUTHORITIES

**A.    The Operating Agreement's Transfer Restrictions Are Enforceable**

12.    The Operating Agreement's transfer restrictions are fully enforceable against the Debtors in this bankruptcy proceeding.  *See, e.g.*, *In re Draughon Training Inst., Inc.*, 119 B.R. 927, 932 (Bankr. W.D. La. 1990) (holding that a debtor in possession "will be bound by whatever non-bankruptcy related transfer restrictions the property of the estate had on it prior to the bankruptcy"); *In re Kramer*, BAP NO-21-005, 2022 WL 17176411, at *8 (B.A.P. 10th Cir. Nov. 23, 2022) (holding that operating agreement transfer restrictions prohibited a bankruptcy trustee from selling membership interests owned by the debtor).

13.    The Operating Agreement is governed by Oklahoma law.  *See* Operating Agreement, Article 10.7.  The Oklahoma Limited Liability Company Act provides that a company's operating agreement governs the relationships, rights, duties, and activities of the company and its members.  18 O.S. § 2012.2(A).  Further, unless the operating agreement provides

otherwise, membership interests are *not* freely transferable, although a member can assign the capital interest associated with a membership interest.  18 O.S. § 2033(A)(1) (emphasis added).  Therefore, under Oklahoma law, transfer restrictions for membership interests are enforceable.  *See, e.g.*, *Kramer*, 2022 WL 17176411, at *4.  Accordingly, the transfer restrictions contained in the Operating Agreement are enforceable against the Debtors and any transferee.

**B.    The Operating Agreement Restricts Transfers Unless Specific Procedures Are Followed**

14.    The Operating Agreement provides that except for "Permitted Transfers" and transfers pursuant to right of first refusal procedures, no member shall have the right to transfer membership units.  *See* Operating Agreement, Article 7.1(a).  "Permitted Transfers" are only transfers to an affiliate of a member or certain trusts established by members.  *See* Operating Agreement, Article 7.2.

15.    Other than "Permitted Transfers," the only exception to the Operating Agreement's transfer restriction is compliance with a right of first refusal ("ROFR") procedure set out in Article 7.3 of the Operating Agreement.  Pursuant thereto, upon receiving a transfer offer, the transferring member must provide notice to the WGU manager and other members.  The non-transferring members then have the right and option to purchase all of the membership units being offered on the same terms and conditions being offered.  If the non-transferring members do not exercise the right of first refusal option, then the transferring member is entitled to sell the units to the prospective purchaser, subject to certain conditions.  If the transferee is not an existing member, such third-party transferee is only admitted as a substitute member upon (i) execution of a joinder agreement, (ii) payment of costs and expenses incurred by WGU in connection with the transfer, and (iii) the approval of the substitution by WGU's manager, which approval "may be granted or

withheld by the Manager in its sole and absolute discretion." *See* Operating Agreement, Article 7.5(b).

### C.    The Debtors' Attempts to Avoid the Transfer Restrictions and ROFR Violate the Operating Agreement

16.    The procedures proposed by the Sale Motion include a scheme to engage in a series of pre-sale transfers in an attempt to circumvent the transfer restrictions and ROFR.  Specifically, the Debtors propose (a) creating a non-debtor affiliate owned and controlled by CCCB, (b) transferring the WGU Asset to the newly-formed entity, and (c) selling CCCB's ownership interest in the affiliate to the winning bidder. *See* Sale Motion ¶ 19.  Such machination, however, will not avoid the transfer restrictions and will result in a sale that is null, void, and not recognized by WGU.  It will further trigger provisions in the Operating Agreement providing for the repurchase of the WGU Asset.

17.    The Operating Agreement broadly defines transfer as follows:

> "Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person.  "Transfer" when used as a noun shall have a correlative meaning.

*See* Operating Agreement, Article 1.8(uuu).  Operating agreement provisions that broadly prohibit both direct and indirect transfers of a beneficial interest are applicable to both direct transfers by the member and upstream transfers by a parent of the ownership interest in the member.  *See In re Asian Yard Partners*, 95-333-PJW, 1995 WL 1781675, at *9 (Bankr. D. Del. Sep. 18, 1995); *see also Nicolas M. Salgo Assocs. V. Cont'l Ill. Props.*, 532 F. Supp. 279, 283 (D.D.C. 1981) (finding

that upstream merger violated parties' partnership agreement prohibiting transfers of partnership interests).

18.     In *Asian Yard*, a chapter 11 debtor owned 100% of an entity (AOC) that owned an interest in a Delaware limited partnership (CAP).  *Id.* at *1.  The debtor filed a motion seeking to sell its interest in AOC.  *Id.*  Two partners in CAP objected, arguing that CAP's partnership agreement contained a blanket prohibition on transfers of interests absent (1) consent by the other partners, (2) transfer to a specifically identified individual, and (3) transfer subject to a right of first refusal.  *Id.* at *4.  The bankruptcy court sided with the partners, finding that the agreement broadly prohibited transfers, including upstream transfers:

> Here, the anti-transfer provision is broadly stated.  It bars a transfer of the partner interest "directly or indirectly, or by operation of law or otherwise."  These words cannot be ignored in applying the provision to the proposed transfer.  By using the words "directly or indirectly" the parties obviously meant that a partner could not do indirectly that which it was prohibited from doing directly.  In my view, the plain meaning of the language encompasses a situation where there is a controlling interest in a partner entity, because such a transaction effectively transfers a partner interest to the control of the party acquiring the controlling interest of the partner entity.

*Id.* at *7.

19.     Like in *Asian Yards*, WGU's Operating Agreement broadly defines transfers to include both direct and indirect transfers, as well as transfers of beneficial interests.  *See* Operating Agreement, Article 1.8(uuu).  Accordingly, while the Debtor's plan to transfer the WGU Asset to a wholly-owned subsidiary may qualify as a "Permitted Transfer" under Article 7.2 of the Operating Agreement, the subsequent sale and transfer of the upstream ownership interests in that subsidiary would still qualify as a transfer to which the transfer restrictions apply.  Unless the upstream sale complies with the Operating Agreement's transfer requirements, the transfer will be null and void.  *See* Operating Agreement, Article 7.1(a).

20. Further, any attempted transfer that does not comply with the transfer requirements will trigger the disqualification provisions of the Operating Agreement. *See* Operating Agreement, Article 8.1. Pursuant thereto, any purported transferee will have no right to participate in WGU's affairs, and the remaining members will have the option to purchase the WGU Asset at a price equal to 10% of the capital contributions actually paid into WGU by CCCB. *See id.*

21. It is anticipated that the Debtors may attempt to rely on cases that have found that right of first refusal provisions are not enforceable in upstream transfers. *See, e.g.*, *Borealis Power Holdings, Inc. v. Hunt Strategic Utility Investment, L.L.C.*, 233 A.3d 1 (Del. Ch. 2020); *Found. for Seacoast Health v. HCA Health Servs. of New Hampshire, Inc.*, 157 N.H. 487, 953 A.2d 420 (2008). Those decisions, however, were based on the specific language of the underlying agreement, which limited the applicability of the right of first refusal to transfers by the member and only the member. The ROFR in the Operating Agreement is distinguishable from those cases and would apply to an attempted upstream transfer.

22. However, even if the ROFR was found to not apply to an upstream transfer, the underlying transfer would still be invalid. The Operating Agreement provides that *all* transfers are prohibited unless they meet one of the limited exceptions. *See* Operating Agreement, Article 7.1(a). The ROFR process is one such exception. Should the Debtors choose to ignore the ROFR process, the transfer will not qualify for any exceptions to the transfer restrictions, rendering the transfer void and any transferee a disqualified member.[2]

---

[2] It also warrants noting that pursuant to the Operating Agreement, any disputes between any purported transferee and other members would be required to be resolved in arbitration proceedings in Oklahoma City, Oklahoma. *See* Operating Agreement, Article 9.

23.     Without complying with the transfer provisions in the Operating Agreement, the Debtors' proposed sale process is flawed and will not result in a valid transfer of the WGU Asset. Accordingly, the Sale Motion must be denied.

**D.     Any Sale Must Be Subject to Outstanding and Prospective Capital Calls**

24.     The Operating Agreement contains provisions governing members' duties with regard to capital calls. *See* Operating Agreement, Article 2. At least one capital call has been issued and not yet satisfied by CCCB. It is anticipated that there will be additional capital calls required to complete the WGU project.

25.     The Sale Motion is silent as to any purchaser's obligations regarding outstanding and future capital calls. Out of an abundance of caution, any approval of bid procedures or sale of the WGU Asset should make clear that any purchaser is assuming all obligations for outstanding and future capital calls, and that the provisions of the Operating Agreement governing capital calls will remain unaffected by any sale.

## IV.     CONCLUSION

WHEREFORE, Black Oak Partners LLC respectfully requests this Court enter an order (a) denying the Sale Motion, and (b) granting such other and further relief as the Court deems appropriate.

PHILLIPS MURRAH P.C.

*/s/ Clayton D. Ketter*
Clayton D. Ketter (Tex. Bar No. 24053651)
Jason A. Sansone (Okla. Bar No. 30913)
424 NW 10th Street, Suite 300
Oklahoma City, OK 73103
Phone: 405.235.4100
Fax: 405.235.4133
cdketter@phillipsmurrah.com
jasansone@phillipsmurrah.com
*Attorneys for Black Oak Partners LLC*

## CERTIFICATE OF SERVICE

This is to certify that on the 9th day of August, 2024, true and correct copies of the above and foregoing were mailed by first-class mail, postage prepaid, to all parties listed on the attached service list.

/s/ Clayton D. Ketter
Clayton D. Ketter (Tex. Bar No. 24053651)

```
Label Matrix for local noticing        (c)BLACK OAK PARTNERS LLC              CCCB Energy Partners, LLC
0541-4                                  C/O CLAYTON D. KETTER                  5944 Luther Lane
Case 23-32810                           PHILLIPS MURRAH P.C.                   Suite 400
Southern District of Texas              101 N ROBINSON AVE FL 13               Dallas, TX 75225-5916
Houston                                 OKLAHOMA CITY OK  73102-5523
Fri Aug  9 10:20:57 CDT 2024

Citizen Energy III, LLC                 Corlena Oil Company                   Cottonwood Gas Gathering, LLC
Spence, Desenberg & Lee, PLLC           619 S. Tyler St. STE 210              101 E. Viejo Drive
1770 St. James Place                    Amarillo, TX 79101-2303               Friendswood, TX 77546-5550
Suite 625
Houston, TX 77056-3500

D-J'S PUMP & SUPPLY, LLC                 D-JS WELL SERVICE & ROUSTABOUT, INC.  Dallas County
c/o John Massouh                        c/o John Massouh                      Linebarger Goggan Blair & Sampson, LLP
SPROUSE LAW FIRM                        SPROUSE LAW FIRM                      c/o John K Turner
PO Box 15008                            PO Box 15008                          2777 N. Stemmons Frwy Ste 1000
Amarillo, TX 79105-5008                 Amarillo, TX 79105-5008               Dallas, TX 75207-2328

Donlin Recano and Co Inc                Highland Park ISD                     Indian Springs Cattle Company, LLC
Donlin Recano and Company               c/o Eboney Cobb                       1201 S Taylor
48 Wall Street, 22nd Floor              Perdue Brandon Fielder et al          Amarillo, TX 79101-4313
New York, NY 10005-2984                 500 East Border Street, Suite 640
                                        Arlington, TX 76010-7457

Longboat Energy, LLC                    NAP I, LLC                            Nova Compression, LLC
1717 Main St., Ste. 3000                5944 Luther Lane                      c/o Steven W. Soule
Dallas, TX   75201-4335                 Suite 400                             Hall, Estill, Hardwick, et al.
                                        Dallas, TX 75225-5916                 521 East 2nd Street
                                                                              Suite 1200
                                                                              Tulsa, OK 74120-1855

Polaris Operating, LLC                  Quasar Energy Services, Inc.          Railroad Commission of Texas
5944 Luther Lane                        3288 FM 51                            c/o Office of the Attorney General
Suite 400                               Gainesville, TX 76240-0208            Bankruptcy & Collections Division
Dallas, TX 75225-5916                                                         P. O. Box 12548
                                                                              Austin, TX 78711-2548

Security State Bank & Trust             Texas Comptroller of Public Accounts, Revenu  Texas Taxing Authorities
c/o Robert L. Barrows                   Kimberly A. Walsh                     Texas Taxing Authorities
Langley & Banack, Inc.                  PO Box 12548                          PO BOX 9132
745 E. Mulberry, Suite 700              Austin, TX 78711-2548                 Amarillo, TX 79105-9132
San Antonio, TX 78212-3172

Triangle Well Service, Co.              4                                     9th Element, LLC f/k/a 6th Element, LLC
Mullin Hoard and Brown, LLP             United States Bankruptcy Court        c/o Rapp & Krock, PC
c/o Brad W. Odell                       PO Box 61010                          1980 Post Oak Blvd., Suite 1200
P.O. Box 2585                           Houston, TX 77208-1010                Houston, Texas 77056-3970
Lubbock, TX 79408-2585

Airgas USA, LLC                         Amarillo National Bank - O&G Dept.    American Express National Bank
110 West 7th St Suite 1400              Attn: Leslie Weaver                   c/o Becket and Lee LLP
Tulsa OK 74119-1077                     PO Box 1                              PO Box 3001
                                        Amarillo, TX 79105-0001               Malvern  PA 19355-0701

BRS Mesa Vista Partners, LLC            Balterra Energy, LLC                  Cisk Ventures, Ltd.
c/o Chris Halgren, McGinnis Lochridge LL PO BOX 888                          c/o Rapp & Krock, PC
609 Main St., Suite 2800                Katy, TX 77492-0888                   1980 Post Oak Blvd., Suite 1200
Houston, TX 77002-3179                                                        Houston, Texas 77056-3970
```

D-J'S PUMP & SUPPLY, LLC
C/O JOHN MASSOUH
SPROUSE SHRADER SMITH
PO BOX 15008
AMARILLO TX 79105-5008

D-J'S WELL SERVICE & ROUSTABOUT, INC.
C/O JOHN MASSOUH
SPROUSE SHRADER SMITH
PO BOX 15008
AMARILLO TX 79105-5008

Dallas County
Linebarger Goggan Blair & Sampson, LLP
c/o John Kendrick Turner
2777 N. Stemmons Freeway
Suite 1000
Dallas, TX 75207-2328

Doris Kenyon Martin Trust, Trudy Martin, Tru
3917 Stone Well Ct.
Norman, OK 73072-5146

Dorothy Faye Thompson
PO Box 15610
Amarillo, TX 79105-5610

Highland Park ISD
c/o Eboney Cobb
Purdue, Brandon, Fielder, Collins & Mott
500 E. Border Street, Suite 640
Arlington, TX 76010-7457

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Indian Springs Cattle Company, LLC
c/o Lovell, Isern & Farabough, LLP
112 SW 8th Ave Ste 1000
Amarillo, TX 79101-2343

J-Brex Company
619 S Tyler Ste 100
Amarillo, TX 79101-2345

Janice Ann Beckley
RR 2 Box 63A
Guymon, OK 73942-9603

Jim Wayne Thomas Revocable Trust
8728 Kimberly Rd
Oklahoma City, OK 73132-3154

John S. Teutsch
2001 Western Ave Ste 330
Seattle, WA 98121-2133

Joseph C. Teutsch
PO Box 804
Buchanan Dam, TX 78609-0804

Joseph Phillip Brent Trust
5009 Williamsburg Pl
Amarillo, TX 79119-4916

Kylee Chester
1100 Quarter Horse Rd
Miami, TX 79059-4202

Lyndon D. Boyer & Geraldine L. Boyer
1435 Pioneer Road
Ponca City, OK 74604-3924

Midwest Compressor Systems, LLC
c/o McCarn, Weir, & Sherwood. PC
905 S. Fillmore, Ste 530
Amarillo, Texas 79101-3518

Momin Syed
c/o Rapp & Krock, PC
1980 Post Oak Blvd., Ste. 1200
Houston, TX 77056-3970

Moore County and Entities Collected by Moore
%PBFCM
PO Box 9132
Amarillo, TX 79105-9132

Musassir Siddiqui
c/o Rapp & Krock, PC
1980 Post Oak Blvd., Suite 1200
Houston, Texas 77056-3970

NSAEB Holdings, LLC
c/o Rapp & Krock, PC
1980 Post Oak Blvd., Suite 1200
Houston, TX 77056-3970

Neal Family 2002 Trust
Attn: Leslie Weaver
PO Box 1
Amarillo, Texas 79105-0001

North Country Energy, LLC
c/o Matthew Sherwood
905 S. Fillmore, Suite 530
Amarillo, TX 79101-3518

Oro Rental, LLC
c/o Rapp & Krock, PC
1980 Post Oak Blvd., Suite 1200
Houston, TX 77056-3970

PSS Industrial Group
10507 Ella Blvd. Suite 100
Houston, TX 77038-2333

Pathward, National Association
c/o Rapp & Krock, PC
1980 Post Oak Blvd., Suite 1200
Houston, Texas 77056-3970

Phillip Brent Minerals Trust
5009 Williamsburg Pl
Amarillo, TX 79119-4916

QUEST DRILLING COMPANY, LLC
8621 E 21ST N SUITE 120
WICHITA KS 67206-2960

Quasar Energy Services, Inc.
c/o Republic Law Group
7 East Main Street
Ardmore OK 73401-7008

Raquel Rebecca Rodriguez
c/o Lovell Hoffman Law, PLLC
1008 S. Madison
Amarillo, TX 79101-3234

Recon Petrotechnologies, Inc.
5304 Big Six Street, Unit B
Alvarado, TX 76009-5238

Robert Price Brent III Trust
PO Box 9194
Amarillo, TX 79105-9194

Robert Price Brent, III
PO Box 9194
Amarillo, TX 79105-9194

Roberts County Appraisal District
%PBFCM
PO BOX 9132
Amarillo, TX 79105-9132

Sharon Lockhart Seymore
237 High Point Cir
Spring Branch, TX 78070-5065

Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993

(p)TXAM PUMPS
ATTN DAVID REISINGER
5623 TUSKEGEE ST
HOUSTON TX 77091-4120

Taxing Districts Collected by Potter County
%PBFCM
PO BOX 9132
Amarillo, TX 79105-9132

Taxing Districts Collected by Randall County
%PBFCM
PO BOX 9132
Amarillo, TX 79105-9132

Teutsch Partners, LLC
2001 Western Ave Ste 330
Seattle, WA 98121-2175

Total Wellhead & Rental Tools, LLC
P.O. Box 1068
Perryton, TX 79070-1068

Travis Chester
1100 Quarter Horse Rd
Miami, TX 79059-4202

Triangle Well Servicing Co.
P.O. Box 1159
Pampa, Texas 79066-1159

Tucker Burton Teutsch, III
3402 Anderson Creek Rd
Talent, OR 97540-7734

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Union Mineral Co., LLC
113 SW 8th Ave
Amarillo, TX 79101-2305

United States Small Business Administration
8701 S. Gessner Rd., Ste. 1200
Houston, TX 77074-2944

Virginia Anne Teutsch Lowe
10 Lana Ln
Houston, TX 77027-5606

W.W. Grainger, Inc.
401 S. Wright Rd.
Janesville, WI 53546-8729

WillCo Energy Services, LLC
PO Box 689
Perryton, Texas 79070-0689

Christopher Adams
Okin & Adams LLP
1113 Vine St
Suite 240
Houston, TX 77002-1044

David L Curry Jr
Okin Adams, LLP
1113 Vine Street
Suite 240
Houston, TX 77002-1044

John Thomas Oldham
Okin Adams LLP
1113 Vine St.
Suite 240
Houston, TX 77002-1044

Matthew W. Sherwood
McCarn & Weir
905 S. Fillmore
Suite 530
Amarillo, TX 79101-3518

c/o C. Jared Knight John Oates Co, Inc
Morgan Williamson LLP
701 S Taylor Suite 324
Amarillo, TX 79101-2417

**FIRST AMENDED AND RESTATED
OPERATING AGREEMENT
OF
WGU ENERGY, LLC**

**EFFECTIVE February 1, 2022**



**Prepared by:
PHILLIPS MURRAH P.C.
Corporate Tower | Thirteenth Floor
101 North Robinson
Oklahoma City, Oklahoma  73102
Telephone: (405) 235-4100
Facsimile: (405) 235-4133**

EXHIBIT

1

# TABLE OF CONTENTS

ARTICLE 1 THE COMPANY ..................................................................................1

  1.1    Formation ...........................................................................................1

  1.2    Name...................................................................................................2

  1.3    Purpose...............................................................................................2

  1.4    Principal Place of Business ..............................................................2

  1.5    Term ...................................................................................................2

  1.6    Filings ................................................................................................2

  1.7    Prospect Area Participation..............................................................2

  1.8    Definitions .......................................................................................12

ARTICLE 2 MEMBERS - CAPITAL CONTRIBUTIONS .................................12

  2.1    Acquisition of Units .......................................................................12

  2.2    Capital Contribution Commitments ...............................................12

  2.3    Capital Contribution Funding; Capital Calls; Default ...................14

  2.4    Phase II Capital Calls .....................................................................16

  2.5    Voluntary Capital Contributions ....................................................16

ARTICLE 3 ALLOCATIONS ...............................................................................16

ARTICLE 4 DISTRIBUTIONS .............................................................................16

  4.1    Distributions ....................................................................................16

  4.2    Sharing of Distributions .................................................................16

  4.3    Amounts Withheld ..........................................................................17

ARTICLE 5 MANAGEMENT ...............................................................................17

  5.1    Authority of the Manager ...............................................................19

  5.2    Initial Manager................................................................................19

  5.3    Resignation, Removal, Vacancies and Decisions of Manager.......20

  5.4    Right to Rely on the Manager.........................................................20

  5.5    Duties and Obligations of a Manager; Member Knowledge of Oil and Gas Business ..................................................................................22

  5.6    Officers ............................................................................................23

  5.7    Indemnification of the Manager and Manager Team .....................23

  5.8    Management Fee; Reimbursement ..................................................23

  5.9    Action by Written Consent .............................................................

**ARTICLE 6 BOOKS AND RECORDS** ............................................................................23

    6.1    Books and Records ............................................................................23

    6.2    Annual Reports ............................................................................24

    6.3    Tax Information ............................................................................24

    6.4    Partnership Representative ............................................................................24

    6.5    Bank Accounts ............................................................................24

**ARTICLE 7 TRANSFER OF UNITS** ............................................................................25

    7.1    In General ............................................................................25

    7.2    Permitted Transfers ............................................................................25

    7.3    ROFR ............................................................................25

    7.4    Transferred Units ............................................................................26

    7.5    Admission as a Substitute Member ............................................................................27

    7.6    Transfer Restrictions ............................................................................27

**ARTICLE 8 DISQUALIFICATION OF A MEMBER; DISSOLUTION AND WINDING UP** ............................................................................28

    8.1    Disqualification of a Member ............................................................................28

    8.2    Dissolution ............................................................................28

    8.3    Winding Up ............................................................................28

    8.4    Compliance with Timing Requirements of Regulations; Deficit Capital Accounts ............................................................................29

    8.5    Reserve ............................................................................29

    8.6    Liquidating Trust ............................................................................29

**ARTICLE 9 DISPUTE RESOLUTION** ............................................................................30

    9.1    Mediation; Submission Requirement ............................................................................30

    9.2    Mediation ............................................................................30

    9.3    Arbitration; Submission Requirement ............................................................................30

    9.4    Arbitration Proceeding ............................................................................30

    9.5    Binding Decision ............................................................................31

**ARTICLE 10 MISCELLANEOUS** ............................................................................31

    10.1    Notices ............................................................................31

    10.2    Binding Effect ............................................................................31

    10.3    Construction ............................................................................31

    10.4    Headings ............................................................................31

| 10.5 | Severability | 32 |
| 10.6 | Additional Documents | 32 |
| 10.7 | Governing Law | 32 |
| 10.8 | Waiver of Action for Partition | 32 |
| 10.9 | Attorneys' Fees | 32 |
| 10.10 | Equitable Remedies | 32 |
| 10.11 | Expenses | 32 |
| 10.12 | Amendment | 32 |
| 10.13 | Counterparts | 33 |
| 10.14 | Defined Terms | 33 |
| 10.15 | Confidentiality | 33 |

## WGU ENERGY, LLC
## FIRST AMENDED AND RESTATED OPERATING AGREEMENT

**THIS FIRST AMENDED AND RESTATED OPERATING AGREEMENT** OF WGU ENERGY, LLC, (this "Agreement") is made and entered into effective as of February 1, 2022 (the "Effective Date"), by and among WGU Energy, LLC, an Oklahoma limited liability company ("WGU" or the "Company"), BTE Energy, LLC, an Oklahoma limited liability company ("BTE"), and any other Persons (the "Investor Members" and collectively with BTE, the "Members") named on the signature pages below and listed on Exhibit "A" attached hereto.

### RECITALS

A.       The Company was formed by Articles of Organization dated and filed with the Oklahoma Secretary of State on January 27, 2021. The Company was initially solely owned by BTE. The Company is subject to that certain Operating Agreement dated effective January 27, 2021 (the "Original Agreement").

B.       After the formation of the Company, BTE contributed certain Oil and Gas Properties, including wells, leases and oil and gas reserves (each a "BTE Contributed Property" and collectively the "BTE Contributed Properties" to the Company pursuant to that certain contribution agreement between the Company and BTE dated February 1, 2022 (the "BTE Contribution Agreement").

C.       Contemporaneously with the execution of this Agreement, the Investor Members are making certain Capital Contributions to the Company in exchange for Units in the Company in accordance with the terms of each such Investor Member's subscription agreement as described in the Private Placement Memorandum (each a "Subscription Agreement" and collectively the "Subscription Agreements"). As of the Effective Date, the Members will concurrently enter into this First Amended and Restated Operating Agreement to reflect such Investor Member's Capital Contributions to the Company and the issuance of Units in the Company in accordance with such Subscription Agreements and this Agreement.

In consideration of the recitals and mutual promises, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby amend and restate the Original Agreement in full by this First Amended and Restated Operating Agreement and agree as follows:

### ARTICLE 1
### THE COMPANY

**1.1**     **Formation**. The Company was formed by Articles of Organization dated and filed with the Oklahoma Secretary of State on January 27, 2021 under and pursuant to the provisions of the Act. The management, affairs and operation of the Company shall be governed by this Agreement.

**1.2**     **Name**. The name of the Company shall be WGU Energy, LLC and all activities and business of the Company will be conducted under that name.

**1.3    Purpose**.  The purpose, nature and character of the business of the Company shall be to engage in any act, activity or business permitted by law with respect to (a) the acquisition and sale of Oil and Gas Properties in the WGU Project Area, (b) the ownership, development, operation, and management of Oil and Gas Properties in the WGU Project Area, and (c) such other activities as are necessary, incidental or appropriate therewith. The enumeration of the business of the Company, while limiting the purposes of the Company, shall not be construed to limit or restrict in any manner the general powers or authority conferred under the Act.

**1.4    Principal Place of Business**.  The principal place of business of the Company shall be at 700 N.W. 5th Street, Oklahoma City, Oklahoma 73102.  The Manager may change the principal place of business of the Company to any other place within the State of Oklahoma upon ten (10) days' written notice to the Members.

**1.5    Term**.  The term of the Company commenced on January 27, 2021 and shall be perpetual, unless the Company is dissolved earlier as set forth in this Agreement.

**1.6    Filings**.  The Manager filed Articles of Organization for the Company on January 27, 2021 under the name set forth in Section 1.2 *[Name]* hereof and shall cause to be filed such other certificates and filings as are required by applicable law in each jurisdiction in which the Company conducts business.

**1.7    Prospect Area Participation**.  With respect to any well or prospect in which the Company decides to acquire an interest (a "Prospect") in the WGU Project Area, to the extent that the Company elects not to acquire all of the interest that is available in the Prospect, the Members will have the right to acquire any remaining interest in the Prospect (on a pro rata basis based on the relative Unit Percentages of all Members desiring to acquire an interest in the Prospect if more than one Member desires to acquire the remaining interest and there is insufficient interest to satisfy the requests of all of such Members).

**1.8    Definitions**.  Capitalized words and phrases used in this Agreement shall have the following meanings:

(a)    "Act" means the Oklahoma Limited Liability Company Act, as set forth in Title 18 of the Oklahoma Statutes, § 2000 *et seq*., as amended from time to time (or any corresponding provisions of succeeding law).

(b)    "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts that such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and

(ii)    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(c)      "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.  As used in this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

(d)      "Agreement" or "Operating Agreement" means this WGU Energy, LLC First Amended and Restated Operating Agreement, as amended from time to time.  Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole unless the context otherwise requires.

(e)      "BTE Contributed Property" has the meaning assigned to it in the Recitals.

(f)      "BTE Contribution Agreement" has the meaning assigned to it in the Recitals.

(g)      "BTE Contribution Value" has the meaning assigned to it in Section 2.2(a) *[Capital Contribution Commitments]* hereof.

(h)      "Capital Account" means, with respect to any Member, the account established and maintained by the Company for such Person in accordance with the following provisions:

(i)      To each Person's Capital Account there shall be credited such Person's Capital Contributions, including the amount of any cash contributed and the fair market value of any property contributed to the Company by such Person, such Person's distributive share of Profits pursuant to ARTICLE 3 *[Allocations]* hereof, any items in the nature of income or gain which are specially allocated pursuant to ARTICLE 3 *[Allocations]* and Exhibit "D" hereof, any other item of income or gain, including any Simulated Gain, allocated to it pursuant to this Agreement, and the amount of any Company liabilities assumed by such Person or which are secured by any Company Property distributed to such Person.

(ii)      To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses pursuant to ARTICLE 3 *[Allocations]* hereof, any items in the nature of expenses or losses which are specially allocated pursuant to ARTICLE 3 *[Allocations]* or Exhibit "D" hereof; any other item of loss or deduction, including Depletion or Simulated Loss allocated to such Person pursuant to this Agreement, and the amount of any liabilities of such Person assumed by the Company or which are secured by any property contributed by such Person to the Company.

(iii)    In the event any Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units and to the extent such succession is necessary to maintain the Capital Accounts in compliance with applicable Regulations.

(iv)    In determining the amount of any liability for purposes of Section 1.8(h) and Section 1.8(h)(ii) *[Definitions: Capital Account]* hereof, there shall be taken into account §752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations § 1.704-1(b), including those related to adjustments to the Capital Account for Simulated Depletion or actual Depletion, Simulated Gain, Simulated Loss and Simulated Adjusted Tax Basis as provided in Regulations §1.704-1(b)(2)(iv)(k), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Manager shall determine that it is reasonable, prudent and fair to all Members to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material adverse effect on the amounts distributable to any Member pursuant to ARTICLE 8 *[Disqualification of a Member; Dissolution and Winding Up]* hereof upon the dissolution of the Company.  The Manager also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations § 1.704-1(b).

(i)    "Capital Call" has the meaning assigned to it in Section 2.3(a) *[Capital Contribution Funding; Capital Calls; Default]*.

(j)    "Capital Contribution" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Units in the Company held by such Member net of any liabilities securing such contributed property that the Company is considered to assume or take subject to pursuant to Section 752 of the Code and which have not been taken into consideration in the computation of the property's Gross Asset Value.

(k)    "Capital Contribution Commitment" means the total amount of Capital Contributions committed to be made to the Company by each Investor Member, as indicated on Exhibit "C" attached hereto.

(l)    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(m)    "Company" means WGU Energy, LLC.

(n)     "Company Minimum Gain" has the same meaning as the term "partnership minimum gain" in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

(o)     "Company Property" means all real and personal property owned, leased, or acquired by the Company from time to time and any improvements thereto and shall include both tangible and intangible property.

(p)     "Contribution Funding Request" has the meaning assigned to it in *Section 2.3 [Capital Contribution Funding; Capital Calls; Default]* hereof.

(q)     "Curing Member" has the meaning assigned to it in *Section 2.3(c) [Capital Contribution Funding; Capital Calls; Default]* hereof.

(r)     "Default Period" has the meaning assigned to it in *Section 2.3(c) [Capital Contribution Funding; Capital Calls; Default]* hereof.

(s)     "Defaulting Member" has the meaning assigned to it in *Section 2.3(c) [Capital Contribution Funding; Capital Calls; Default]* hereof.

(t)     "Deficiency" has the meaning assigned to it in *Section 2.3(c) [Capital Contribution Funding; Capital Calls; Default]* hereof.

(u)     "Deficiency Notice" has the meaning assigned to it in *Section 2.3(c) [Capital Contribution Funding; Capital Calls; Default]* hereof.

(v)     "Depletion" means, for each fiscal year or other period, an amount equal to the depletion as determined pursuant to Regulations § 1.704-1(b).

(w)     "Depreciation" means, for each fiscal year or other pertinent period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

(x)     "Designated Individual" has the meaning assigned to it in *Section 6.4 [Partnership Representative]* hereof.

(y)     "Disqualified Member" has the meaning assigned to it in *Section 8.1 [Disqualification of a Member]*.

(z)     "Gross Asset Value" means, with respect to any asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as reasonably

determined by the contributing Member and the Company;

(ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market value, as reasonably determined by the Manager as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of Company Property as consideration for an interest in the Company if the Manager reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (C) the liquidation of the Company within the meaning of Regulations §1.704-1(b)(2)(ii)(g);

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to § 734(b) or § 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m), ARTICLE 3 *[Allocations]* and Exhibit "D" hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.8(z)(iv) *[Definitions: Gross Asset Value]* to the extent the Manager determines that an adjustment pursuant to Section 1.8(z)(ii) *[Definitions: Gross Asset Value]* is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.8(z)(iv) *[Definitions: Gross Asset Value]*.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to this Section 1.8(z) *[Definitions: Gross Asset Value]*, such Gross Asset Value shall thereafter be adjusted by the Depreciation and Depletion taken into account with respect to such asset for purposes of computing Profits and Losses.

(aa)     "Interest Rate" means that varying rate of interest per annum equal to the "prime lending rate" of Bank of America, N.A. plus five percent (5%) to be charged to a Defaulting Member as set forth in Section 2.3(c) *[Capital Contribution Funding; Capital Calls; Default]* hereof and which shall change simultaneously with each change in the "prime lending rate" of Bank of America, N.A.

(bb)     "Investor Members" mean those Members who have signed Subscription Agreements agreeing to make Capital Contributions to the Company and executing a signature page agreeing to be bound by the terms hereof.

(cc)     "Majority of the Members" shall mean those Members holding a majority of the issued and outstanding Units.

(dd)   "Manager" means BTE or any other Person who becomes a Manager pursuant to the terms of this Agreement.

(ee)   "Manager Affiliates" has the meaning assigned to it in Section 5.5(f) *[Duties and Obligations of a Manager; Member Knowledge of Oil and Gas Business]*.

(ff)   "Manager Team" has the meaning assigned to it in Section 5.7(a) *[Indemnification of the Manager and Manager Team]*.

(gg)   "Members" mean BTE and the Investor Members listed on Exhibit "A" attached hereto, their successors or assigns, or any other person or entity provided such successors, assigns or other persons or entities are admitted to the Company as a Member pursuant to the terms of this Agreement.

(hh)   "Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

(ii)   "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

(jj)   "Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(kk)   "Net Cash Flow" means the gross cash receipts of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, taxes, insurance, contingencies, and reasonable cash requirements for future acquisitions and development of Oil and Gas Properties and other Company business and investment interests, all as determined by the Manager in the Manager's sole discretion.   "Net Cash Flow" shall not be reduced by Depletion, Depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

(ll)   "Nonrecourse Deductions" has the meaning set forth in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

(mm)   "Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

(nn)   "Non-Transferring Member" has the meaning assigned to it in Section 7.3(a) *[ROFR]*.

(oo)   "Offer" has the meaning assigned to it in Section 7.3(a) *[ROFR]*.

(pp)   "Offered Units" has the meaning assigned to it in Section 7.3(a)(i) *[ROFR]* hereof.

(qq)   "Oil and Gas Properties" means any estate, interest or right, or any option or contractual right to acquire any such estate, interest or right, in (i) any fee or term mineral or royalty interest, oil and gas lease, or pooling, communitization or unitization agreement or order, (ii) any other agreement or arrangement which creates or effects an interest in, or right to obtain, capture or receive, hydrocarbons, including, without limitation, any right to receive any of the proceeds attributable to the sale of those hydrocarbons, and all rights appurtenant to such interest or right or (iii) any tangible or intangible real or personal property used in connection therewith.

(rr)   "Partnership Representative" has the meaning assigned to it in Section 6.4 *[Partnership Representative]* hereof.

(ss)   "Person" means any individual, partnership, corporation, limited liability company, trust or other entity.

(tt)   "Phase I" means the first stage of the WGU Project in which the Company will develop the core area of the WGU Project Area by drilling, converting and completing new producing, injection and water supply wells, installing a pipeline infrastructure for the WGU Project and installing pumping units on producing wells, as more particularly described in the Supplement to Confidential Private Placement Memorandum of the Company dated January 25, 2022.

(uu)   "Phase II" means the second stage of the WGU Project in which the Company may develop the remaining areas of the WGU Project Area by drilling, converting and completing new producing and injection wells and installing additional pipeline and electric infrastructure to tie in the Phase II wells into the existing infrastructure, as more particularly described in the Supplement to Confidential Private Placement Memorandum of the Company dated January 25, 2022.

(vv)   "Phase II Capital Calls" means Capital Calls made by the Manager to fund Phase II of the WGU Project.

(ww)   "Phase II Contributing Member" has the meaning assigned to it in Section 2.4(a) *[Phase II Capital Calls]*.

(xx)   "Phase II Contribution" has the meaning assigned to it in Section 2.4(a) *[Phase II Capital Calls]*.

(yy)   "Phase II Curing Member" has the meaning assigned to it in Section 2.4(d) *[Phase II Capital Calls]*.

(zz)   "Phase II Defaulting Member" has the meaning assigned to it in Section 2.4(d) *[Phase II Capital Calls]*.

(aaa)   "Phase II Deficiency" has the meaning assigned to it in Section 2.4(d) *[Phase II Capital Calls]*.

(bbb)    "Phase II Deficiency Notice" has the meaning assigned to it in Section 2.4(d) *[Phase II Capital Calls]*.

(ccc)    "Phase II Requested Capital" has the meaning assigned to it in Section 2.4(a) *[Phase II Capital Calls]*.

(ddd)    "Phase II Units" has the meaning assigned to it in Section 2.4(c) *[Phase II Capital Calls]*.

(eee)    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with § 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to § 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

    (i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.8(tt) *[Definitions: Profits and Losses]* shall be added to such taxable income or loss;

    (ii)    Any expenditures of the Company described in § 705(a)(2)(B) of the Code or treated as Code § 705(a)(2)(B) expenditures pursuant to Regulations § 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.8(tt) *[Definitions: Profits and Losses]* shall be subtracted from such taxable income or loss;

    (iii)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.8(z)(iii) *[Definitions: Gross Asset Value]* or Section 1.8(h)(iv) *[Definitions: Capital Account]* hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

    (iv)    Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

    (v)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 1.8(w) *[Definitions: Depreciation]* hereof;

    (vi)    In lieu of the depletion deductions taken into account in computing such taxable income or loss, there shall be taken into account Depletion for such fiscal year or other period, computed in accordance with Section 1.8(v) *[Definitions: Depletion]* hereof; and

(vii)   Notwithstanding any other provision of this Section 1.8(tt) *[Definitions: Profits and Losses]*, Simulated Gain and Simulated Loss and any items which are specially allocated pursuant to Exhibit "D" hereof shall not be taken into account in computing Profits or Losses.

(fff)   "Prospect" has the meaning assigned to it in Section 1.7 *[Prospect Area Participation]*.

(ggg)   "Proved Producing Reserves" means "Proved Reserves" that are also "Developed Producing Reserves" as those terms are defined in the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

(hhh)   "PV-9 Value" means, with respect to Oil and Gas Properties of the Company constituting Proved Producing Reserves, the present value, discounted at nine percent per annum (compounded annually), of the estimated net cash flow to be realized from the production of hydrocarbons from all such Oil and Gas Properties.

(iii)   "Regulations" means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(jjj)   "Regulatory Allocations" has the meaning set forth in Exhibit "D".

(kkk)   "Right of First Refusal" has the meaning assigned to it in Section 7.3(c) *[ROFR]* hereof.

(lll)   "ROFR Option" has the meaning assigned to it in Section 7.3(b) *[ROFR]* hereof.

(mmm)"ROFR Option Period" has the meaning assigned to it in Section 7.3(b) *[ROFR]* hereof.

(nnn)   "Simulated Basis" shall mean the aggregate adjusted depletable tax basis credited to the Capital Accounts of all Members in each oil or gas property (as defined in Section 614 of the Code) at the time the property first becomes a property of the Company. Thereafter, such Simulated Basis for each property shall be adjusted from time to time in the same manner as if the Simulated Basis were the Company's adjusted tax basis in such property to reflect (a) additions to basis, and (b) Simulated Depletion Deductions; and the Simulated Basis, as adjusted, shall be utilized to determine Simulated Gain or Simulated Loss.

(ooo)   "Simulated Depletion Deduction" shall mean the Simulated Depletion Deduction, computed at the Company level, in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2) or (k)(3) with respect to each property in which the Company owns a depletable interest, and which depletion deduction is solely for the purpose of maintaining Capital Accounts.

(ppp)   "Simulated Gain" shall mean the Simulated Gain realized by the Company upon the taxable disposition of an oil or gas property of the Company, determined by subtracting its Simulated Basis in the property from the amount realized upon such disposition.

(qqq)   "Simulated Loss" shall mean the Simulated Loss realized by the Company upon the taxable disposition of an oil or gas property of the Company, determined by subtracting its Simulated Basis in the property from the amount realized upon the disposition.

(rrr)   "Subscription Agreements" has the meaning assigned to it in the Recitals.

(sss)   "Substitute Member" shall mean a Person to whom a Member has transferred Units in accordance with the terms and conditions of ARTICLE 7 *[Tranfer of Units]* and who has satisfied the transfer requirements of Section 7.5 *[Admission as a Substitute Member]*.

(ttt)   "Tax Amount" has the meaning assigned to it in Section 4.1 *[Distributions]* hereof.

(uuu)   "Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "Transfer" when used as a noun shall have a correlative meaning.

(vvv)   "Transfer Notice" has the meaning assigned to it in Section 7.3(a) *[ROFR]* hereof.

(www) "Transferor" has the meaning assigned to it in Section 7.3(a) *[ROFR]* hereof.

(xxx)   "Unfunded Capital Notice" has the meaning assigned to it in Section 2.4(b) *[Phase II Capital Calls]*.

(yyy)   "Unit" means any one of the definitive equal parts of an ownership interest in the Company acquired by the Members in exchange for each Members' Capital Contribution to the Company, determined on the basis set forth in ARTICLE 2 *[Members - Capital Contributions]* hereof.

(zzz)   "Unit Percentage" means, as to any Member, the percentage that the number of Units acquired by such Member bears to the number of all then outstanding Units.

(aaaa)   "WGU Project" shall mean the West Goldsby waterflood project, a unitized secondary oil and gas recovery operation to be developed by the Company in McClain County, Oklahoma, bifurcated into Phase I and Phase II.

(bbbb) "WGU Project Area" shall mean the area outlined on the map of the WGU Project, attached hereto as Exhibit "E".

## ARTICLE 2
## MEMBERS - CAPITAL CONTRIBUTIONS

**2.1     Acquisition of Units**.  The number of Units acquired in the Company by each Member and such Member's Unit Percentage is as set forth in Exhibit "A" attached hereto.

**2.2     Capital Contribution Commitments**.

(a)      Prior to the Effective Date, BTE has (i) made significant capital expenditures on behalf of the Company, including the acquisition of leases, wells and oil and gas reserves, payment of professional fees (geology, engineering, land, legal and accounting), and other expenditures and (ii) contributed the BTE Contributed Properties to the Company pursuant to the BTE Contribution Agreement. The Members agree that such BTE Contributed Properties have a fair market value as set forth on Exhibit "B" attached hereto (the "BTE Contribution Value"). The Members further agree that the Company shall reimburse BTE on the Effective Date for certain preformation capital expenditures (including geology, engineering, land, environmental, and surveying expenditures associated with the WGU Project) in an amount equal to 2.5% of the Capital Contribution Commitments as set forth on Exhibit "B". The Company and the Members agree that such reimbursement shall be allocated pro rata among the BTE Contributed Properties based upon their respective fair market values. The Members agree that the net Capital Contribution to be credited to BTE's Capital Account shall be equal to the BTE Contribution Value less the reimbursement for preformation capital expenditures.

(b)      As of the Effective Date, each Investor Member has committed to contribute to the Company the amount set forth on Exhibit "C" for such Investor Member and each Investor Member shall make Capital Contributions to the Company as requested pursuant to Section 2.3 *[Capital Contribution Funding; Capital Calls; Default]* below.

(c)      Except as otherwise provided in this Agreement, no Member shall have the right to withdraw any Capital Contributions or resign as a Member of the Company.  Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash, except as may be specifically provided herein.

(d)      Neither the Manager nor any Member shall receive any interest, compensation or drawing with respect to their Capital Contributions or their Capital Account or for services rendered for or on behalf of the Company, except as otherwise provided in this Agreement.

**2.3     Capital Contribution Funding; Capital Calls; Default**.  On or before the Effective Date, each Investor Member shall contribute fifty percent (50%) of such Investor Member's Capital Contribution Commitment.  Thereafter, when the Company has spent seventy-five percent (75%) of the initial funding from Investor Members on Phase I development expenses, each Investor Member shall fund the balance of such Investor Member's Capital Contribution

Commitment within ten (10) days of receipt of an invoice (a "Contribution Funding Request") from the Manager to the Investor Members.

(a)      In the event the Manager determines that additional funds in excess of the Capital Contribution Commitments are necessary for the reasonable needs of the Company's business (except for funds needed to commence Phase II of the WGU Project, which funds shall be governed by Section 2.4 *[Phase II Capital Calls]* below), the Manager may require the Members, including BTE, to make additional Capital Contributions to the Company by giving written notice to the Members in a Contribution Funding Request ("Capital Call") as provided herein. The Capital Calls may be in such amounts and at such times as determined by the Manager in the Manager's discretion; provided that the additional Capital Contributions under such Capital Calls shall be made by each Member on a pro-rata basis in proportion to their respective Unit Percentages. Each Member shall fund the Capital Call within 20 days of receipt of a Contribution Funding Request from the Manager.

(b)      All Capital Contributions required hereunder shall be made by wire transfer of immediately available U.S. funds on the date specified in this ARTICLE 2 *[Members – Capital Contributions]* and shall be used for the acquisition, drilling, development and operation of Oil and Gas Properties by the Company. Except as specifically set forth in this ARTICLE 2 *[Members – Capital Contributions]*, no Member shall be required to make any other Capital Contributions to the Company.

(c)      If a Member fails to make any required Capital Contribution under this Section 2.3 *[Capital Contribution Funding; Capital Calls; Default]*, then the Manager will promptly provide written notice of such failure to such Member, and such Member will have fourteen (14) days from receipt of such written notice to make such Capital Contribution in the full amount requested from the Manager, plus interest on such amount at the Interest Rate, accruing from the date such Capital Contribution was originally due to the date such Capital Contribution is actually made; provided that, any such interest paid will not be treated as a Capital Contribution, and no adjustment to the Members' Capital Accounts will be made with respect thereto. The aggregate amount of any Capital Contribution remaining unpaid after such fourteen (14)-day cure period is referred to as a "Deficiency". If a Member fails to timely make a Capital Contribution after being given the opportunity to cure such failure pursuant to this Section 2.3(c) *[Capital Contribution Funding; Capital Calls; Default]* (such Member, a "Defaulting Member"), then the Manager will deliver written notice of the Deficiency to each Member that contributed its full pro rata share of the required Capital Contributions, which notice (the "Deficiency Notice") will indicate the amount of the Deficiency. Within ten (10) days after receipt of the Deficiency Notice, the Members receiving the Deficiency Notice may elect, by written notice to the Manager, to fund the Deficiency on behalf of the Defaulting Member (each such Member funding any part of the Deficiency, a "Curing Member"). If the Deficiency is a result of the failure of an Investor Member to fund the amounts due under the Subscription Agreement, then (i) upon contributions by the Curing Members, the Company shall issue each Curing Member additional Units in the Company determined by dividing the amount of the Deficiency contributed from each such Curing Member by the Unit subscription price of the Defaulting Member under the Subscription Agreement, and (ii)

regardless of whether the Deficiency is funded by any Curing Members, a pro rata portion of the Units held by the Defaulting Member shall be cancelled equal to the proportion that the amount of the Deficiency bears to the total Capital Contribution Commitment of such Defaulting Member. If the Deficiency is a result of the Defaulting Member failing to contribute its pro-rata share of any additional Capital Call, the Company shall adjust the number of Units owned by the Defaulting Member and the Curing Members based upon the Manager's determination of the reasonable value of the Units at such time. Additionally, the Curing Members or, if none, the Company shall have the option to purchase the Defaulting Member's non-cancelled Units at a price equal to 10% of the Capital Contribution actually paid into the Company by the Defaulting Member, which option shall be exercisable for 30 days following receipt of the Deficiency Notice. Unless otherwise agreed among the Curing Members, each Curing Member will have the right to fund a maximum amount of the Deficiency and purchase the Units of the Defaulting Member equal to such Curing Member's pro rata portion thereof (i.e., based on the number of Units held by such Curing Member divided by the number of Units held by all Curing Members electing to fund the Deficiency).

(d)    The provisions of this Section 2.3 *[Capital Contribution Funding; Capital Calls; Default]* are for the sole benefit of the Company and shall not be deemed to create any agreement for the benefit of any "third party beneficiary" or any person or entity not a party to this Agreement.

## 2.4    Phase II Capital Calls.

(a)    If Phase II of the WGU Project is approved by Members holding the requisite number of Units in accordance with Section 5.1 *[Authority of the Manager]*, if the Company does not finance the Phase II development with available funds or debt financing, the Manager may request the Members, including BTE, to make additional Capital Contributions to the Company through a Phase II Capital Call by giving written notice to the Members in a Contribution Funding Request as provided herein. A Phase II Capital Call may be made by the Manager in such amount and at such time as determined by the Manager in the Manager's discretion. Each Member shall have the option, but not the obligation, to contribute up to such Member's pro rata portion of the funds requested under a Phase II Capital Call (the "Phase II Requested Capital"). If a Member elects to contribute to a Phase II Capital Call (a "Phase II Contributing Member"), such Member shall fund its portion of the Phase II Requested Capital ("Phase II Contribution") within 20 days of receipt of a Contribution Funding Request from the Manager; provided, however, that the Manager may, in its discretion, call the Phase II Requested Capital in two tranches similar to the Phase I Capital Contribution Commitments (i.e., each Phase II Contributing Member initially contributes 50% of its Phase II Contribution and contributes the balance of its Phase II Contribution once the Company has spent seventy-five percent (75%) of the initial Phase II Contributions received from the Phase II Contributing Members with respect to the Phase II Requested Capital on Phase II development expenses).

(b)    If one or more Members elect not to contribute their full pro rata portion of a Phase II Capital Call under this Section 2.4 *[Phase II Capital Call]*, then the Manager will deliver written notice of the unfunded Phase II Requested Capital to each Phase II

Contributing Member that contributed its full pro rata share of the Phase II Requested Capital, which notice (the "Unfunded Capital Notice") will indicate the amount of the unfunded Phase II Requested Capital. Within ten (10) days after receipt of the Unfunded Capital Notice, the Phase II Contributing Members receiving the Unfunded Capital Notice may elect, by written notice to the Manager, to fund up to their pro rata portion of the unfunded Phase II Requested Capital. The Manager shall repeat this process until either all of the Phase II Requested Capital has been funded or no Phase II Contributing Member elects to contribute additional capital to the remaining unfunded Phase II Requested Capital.

(c)     Each Phase II Contributing Member shall receive additional Units (the "Phase II Units") for its Phase II Contribution based on a Company valuation (to be valued as of the date Phase II is approved by the Members) equal to the PV-9 Value of the Company's Oil and Gas Properties as determined by an independent engineering firm. The price of each additional Unit will be equal to the PV-9 Value of the Company's Oil and Gas Properties, divided by the outstanding and issued Units of the Company as of the date Phase II is approved by the Members. Except as set forth in Section 2.4(d) *[Phase II Capital Calls]* for Phase II Contributing Members, no Member shall be in default hereunder for electing not to contribute to a Phase II Capital Call; provided, however, that such non-contributing Member's Unit Percentage shall be diluted to account for the additional Phase II Units issued to the Phase II Contributing Members pursuant to this Section 2.4(c) *[Phase II Capital Calls]*.

(d)     If the Manager elects to have the Phase II Contributing Members fund their Phase II Contributions in two separate payments and a Phase II Contributing Member fails to fund the balance of its Phase II Contribution upon receiving notice from the Manager that such is due, then the Manager will promptly provide written notice of such failure to such Member, and such Member will have fourteen (14) days from receipt of such written notice to make such Phase II Contribution in the full amount requested from the Manager, plus interest on such amount at the Interest Rate, accruing from the date such Phase II Contribution was originally due to the date such Phase II Contribution is actually made; provided that, any such interest paid will not be treated as a Phase II Contribution, and no adjustment to the Members' Capital Accounts will be made with respect thereto. The aggregate amount of any Phase II Contribution remaining unpaid after such fourteen (14)-day cure period is referred to as a "Phase II Deficiency". If a Phase II Contributing Member fails to timely make a Phase II Contribution after being given the opportunity to cure such failure pursuant to this Section 2.4(d) *[Phase II Capital Calls]* (such Member, a "Phase II Defaulting Member"), then the Manager will deliver written notice of the Phase II Deficiency to each Phase II Contributing Member that contributed its full Phase II Contribution, which notice (the "Phase II Deficiency Notice") will indicate the amount of the Phase II Deficiency. Within ten (10) days after receipt of the Phase II Deficiency Notice, the Phase II Contributing Members receiving the Phase II Deficiency Notice may elect, by written notice to the Manager, to fund the Phase II Deficiency on behalf of the Phase II Defaulting Member (each such Phase II Contributing Member funding any part of the Phase II Deficiency, a "Phase II Curing Member"). Upon contributions by the Phase II Curing Members, the Company shall issue each Phase II Curing Member additional Units in the Company determined by dividing the amount of the Phase II Deficiency contributed

from each such Phase II Curing Member by the Phase II Unit valuation determined in accordance with Section 2.4(c) *[Phase II Capital Calls]*. Regardless of whether the Phase II Deficiency is funded by any Phase II Curing Members, a pro rata portion of the Phase II Units issued to the Phase II Defaulting Member pursuant to Section 2.4(c) *[Phase II Capital Calls]* above shall be cancelled equal to the proportion that the amount of the Phase II Deficiency bears to the total Phase II Contribution of such Phase II Defaulting Member. Unless otherwise agreed among the Phase II Curing Members, each Phase II Curing Member will have the right to fund a maximum amount of the Phase II Deficiency equal to such Phase II Curing Member's pro rata portion thereof (i.e., based on the number of Units held by such Phase II Curing Member divided by the number of Units held by all Phase II Curing Members electing to fund the Phase II Deficiency).

**2.5 Voluntary Capital Contributions.** Except as provided in Section 2.2 *[Capital Contribution Commitments]* and Section 2.3 *[Capital Contribution Funding; Capital Calls; Default]*, no Investor Member may make an additional Capital Contribution without the consent of the Manager and a Majority of the Members.

## ARTICLE 3
## ALLOCATIONS

After giving effect to the special allocations set forth in Exhibit "D", all Profits and Losses of the Company shall be allocated among the Members in accordance with their Unit Percentages.

## ARTICLE 4
## DISTRIBUTIONS

**4.1 Distributions.** The amount of Net Cash Flow available for distribution shall be determined by the Manager, and any distributions of Net Cash Flow shall be made on a quarterly basis within thirty (30) days following the end each calendar quarter. All such distributions, (other than liquidating distributions upon dissolution of the Company made pursuant to Section 8.3 *[Winding Up]*), shall be distributed to the Members in accordance with their Unit Percentages. Subject to the restrictions provided for in this ARTICLE 4 *[Distributions]* and the provisions of Section 8.3 *[Winding Up]* and Section 8.4 *[Compliance with Timing Requirements of Regulations; Deficit Capital Accounts]*, if the total distributions made to a Member during any year are less than such Member's Tax Amount, then the Manager shall cause the Company to distribute to the Member from Net Cash Flow, if any, an amount equal to such difference within 150 days following the end of such year. For purposes of this Agreement, a Member's "Tax Amount" shall mean 35% of the difference of the Company's taxable income allocated to such Member for such year minus the excess, if any, of cumulative taxable losses over cumulative taxable income allocated to such Member for prior years. For purposes of computing taxable income it will be assumed that each Member has deducted his/her share of intangible drilling costs and is eligible to deduct his/her share of tentative cost and percentage depletion computed in accordance with the Code but without regard for the 1,000 barrel a day limitation under IRC Section 613A.

**4.2 Sharing of Distributions.** All non-liquidating distributions to the Members shall be allocated among the Members in accordance with each Member's respective Unit Percentages.

**4.3**   **Amounts Withheld**.  All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the Members shall be treated as amounts distributed to the Members pursuant to this ARTICLE 4 *[Distributions]* for all purposes under this Agreement.

**ARTICLE 5**
**MANAGEMENT**

**5.1**   **Authority of the Manager**.  Except to the extent otherwise provided herein, the business and affairs of the Company shall be managed by the Manager.  The Manager shall direct the business of the Company and shall have full and complete authority and discretion to make any and all decisions concerning the business. ·The Manager shall have the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by Manager under the Act including, without limitation, the right and power to:

(a)   Acquire by purchase, lease or otherwise any real or personal property which may be reasonably necessary or incidental to the accomplishment of the purposes of the Company, including but not limited to, Oil and Gas Properties;

(b)   Operate, maintain, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage and lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purpose of the Company, provided that the sale or other disposition of all or substantially all of the assets of the Company shall require consent of a Majority of the Members;

(c)   Borrow money and issue evidences of indebtedness necessary, convenient or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge or other lien on any Company Property, provided that any loan made to the Company in excess of One Million Dollars ($1,000,000) shall require consent of a Majority of the Members;

(d)   Issue additional Units or other equity to existing Members or to new Members in connection with the admission of such new Members to the Company, provided that (i) the issuance of any such additional Units or other equity shall be on terms which are no more favorable (as reasonably determined by the Manager) than those applicable to the initial Capital Contributions by the Members to the Company as set forth in Section 2.1 *[Acquisition of Units]* above and (ii) each existing Member shall have the preemptive right to acquire such existing Member's Unit Percentage of any such additional Units or other equity being issued by the Company on the same terms as such Additional Units are offered;

(e)   Authorize or reject, in the Manager's sole discretion, the transfer of any Units owned by a Member to any transferee upon request from such Member and admit the transferee as a Member upon agreeing to be bound by the terms of this Agreement, subject to the provisions of ARTICLE 7 *[Transfer of Units]*;

(f)   Execute any and all agreements, contracts, documents, certifications and instruments reasonably necessary in connection with the management, maintenance and

operation of Company Property, including, without limitation, contracts pursuant to which the Company hedges the price to be received for future production of its hydrocarbons, including swaps under which the Company agrees to pay a price for a specified amount of hydrocarbons determined by reference to a recognized market on a specified future date and the contracting party agrees to pay the Company a fixed price for the same or similar amount of hydrocarbons;

(g)     Execute, in furtherance of any or all of the purposes of the Company, any assignment, deed, lease, bill of sale, contract or other instrument purporting to convey any or all of the Company Property, but only to the extent such conveyance complies with the terms of this Agreement;

(h)     Care for and distribute funds to the Members by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(i)     Contract on behalf of the Company for the employment and service of employees and/or independent contractors and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(j)     Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company Property and Manager's liability, and risk management contracts such as ISDA Swap Agreements and similar agreements) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(k)     Make any and all elections for federal, state and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Company Property pursuant to §§754, 734(b) and 743(b) of the Code, or comparable provisions of state or local law, in connection with transfers of interests in the Company and Company distributions; (ii) to compute Depletion, for purposes of maintaining the Member's respective capital accounts, on a Simulated Basis or in accordance with the actual depletion allowance of the respective Members, as set forth in Regulations §1.704-1(b)(2)(iv)(k); (iii) to deduct or capitalize intangible drilling and development costs; (iv) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state or local tax returns; and (v) to represent the Company and Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and all Members, and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Company and the Members with respect to such tax matters or otherwise affect the rights of the Company and Members;

(l)     Manage the Company's oil and gas price risks by entering into hedge contracts, such as swap agreements and option agreements, to hedge the Company's oil and

gas prices, and close out such positions from time-to-time as the Manager deems appropriate in its sole discretion;

(m)     Cause to be paid all invoices and expenses incurred by the Company; and

(n)     Open and maintain checking accounts at banking institutions as are necessary to conduct the Company's business affairs.

Notwithstanding the foregoing, prior to commencing Phase II of the WGU Project, the Manager must obtain approval of the Phase II development plan and the funding thereof from Members (including BTE) holding at least seventy-five percent (75%) of the issued and outstanding Units of the Company. Except as specifically provided herein or as required in the Act, the Members shall have no right to vote or authority to act on behalf of the Company.

**5.2     Initial Manager.**  BTE shall be the initial Manager of the Company. BTE shall have the sole right to appoint additional Managers of the Company; provided, however, that if BTE is no longer a Member of the Company or has been removed as Manager pursuant to Section 5.3(b) *[Resignation, Removal, Vacancies and Decisions of Manager]*, then the appointment of Managers shall be determined by a Majority of the Members.

**5.3     Resignation, Removal, Vacancies and Decisions of Manager.**

(a)     Any Manager may resign at any time by giving written notice to the Company.  The resignation of any Manager shall take effect upon the receipt of notice or at such time as shall be specified in the notice. The acceptance of the resignation shall not be necessary to make such resignation effective.

(b)     A Manager, other than BTE, may be removed at any time as Manager by BTE, or if BTE is no longer a Member of the Company, by a Majority of the Members. BTE may not be removed as the Manager of the Company except for BTE's gross negligence or intentional misconduct in the management of the Company that has caused material economic harm to the Company and then also only with the vote of a Majority of the Members.

(c)     Upon the resignation, death or removal of any Manager, BTE shall appoint a successor Manager or Managers to fill the vacancy; provided, however, that if BTE is no longer a Member of the Company or has been removed as Manager pursuant to Section 5.3(b) *[Resignation, Removal, Vacancies and Decisions of Manager]*, then a Majority of the Members shall appoint a successor Manager or Managers. A Manager shall hold office until the Manager's successor has been duly elected and qualified, or until the Manager's earlier resignation or removal.

(d)     If at any time there is more than one Manager of the Company, all decisions of the Managers shall be made by a majority of the Managers (i.e., an affirmative vote of a majority of the number of Managers who are entitled to vote upon the matter in accordance with this Agreement).

**5.4**   **Right to Rely on the Manager**.  Any Person dealing with the Company may rely upon a certificate signed by the Manager as to:

(a)   The identity of the Manager or a Member;

(b)   The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company;

(c)   The Persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)   Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

**5.5**   **Duties and Obligations of a Manager; Member Knowledge of Oil and Gas Business**.

(a)   The Manager shall take all reasonable actions which may be reasonably necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Oklahoma (and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged) and (ii) for the acquisition, development, maintenance, preservation and operation of Company Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(b)   The Manager shall use commercially reasonable efforts for the safekeeping and use of all Company Property for the exclusive benefit of the Company, whether or not in the immediate possession or control of the Manager and shall not use or permit any Person to use Company Property in any manner except for the exclusive benefit of the Company.

(c)   The Manager shall devote to the Company such time as may be necessary for the proper and diligent performance of all duties of the Manager hereunder, but the Manager shall not be required to devote full time to the performance of such duties.

(d)   In connection with the acquisition or development of any Oil and Gas Properties, the Manager shall take such steps as are commercially reasonable, in the Manager's discretion, to determine that title to all properties of the Company is satisfactory (under normal industry standards) and that such Oil and Gas Properties are free from material environmental hazards and/or other claims.  However, the Manager shall be free to use the Manager's discretion in waiving title requirements, potential environmental defects and/or other claims, and the Manager shall not be liable to the Company or the Members for any mistakes of judgment made in good faith, nor shall the Manager be deemed to be making any warranties or representations, express or implied, as to the validity or merchantability of title to any Oil and Gas Properties to be acquired or to the environmental condition of any such properties.

(e)     During the term hereof, the Manager shall obtain and keep in force insurance in favor of the Company with such insurers and in such amounts as the Manager shall reasonably deem advisable.

(f)     Notwithstanding anything in this Agreement to the contrary, each of the Company and the Members acknowledges and agrees that each of BTE, its managers, members, Mesa Land and Cattle Company, LLC, JCSM Properties, Inc., Blackfin Energy, LLC, Black Oak Energy Holdings, LLC, Arrakeen Resource Ltd Co and their respective officers, directors, shareholders, members, managers, employees and affiliates, including Twisted Oak Operating, LLC (all such Persons, being collectively hereinafter referred to as the "Manager Affiliates") (i) have made, prior to the date hereof, and are expected to make, on and after the date hereof, other investments (directly and indirectly), and (ii) have engaged, prior to the date hereof, and are expected to engage, on and after the date hereof, in other transactions with and with respect to, in each case, Persons engaged in businesses that, directly or indirectly, may compete with the business of the Company as conducted from time to time or as expected to be conducted from time to time.  In addition, each of the Company and the Members acknowledge and agree that the Manager Affiliates are actively engaged in, and will continue to be engaged in, the ownership, management and operation of one or more businesses and business entities that are involved in the exploration and production of oil and gas, and in the operation and management of oil and gas properties.  The Company and the Members agree that any involvement, engagement or participation of such Manager Affiliates in such investments, transactions and businesses, even if in direct competition with the Company, shall not be deemed wrongful or improper or to violate any duty, express or implied, under applicable law, provided that such involvement, engagement or participation is outside of the WGU Project Area.

(g)     The Company and each Member hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any of the Manager Affiliates participates or seeks to participate located outside of the WGU Project Area.  No Manager Affiliate shall have any obligation to communicate or offer any business opportunity to the Company or the Members located outside of the WGU Project Area, and each of the Manager Affiliates may pursue for itself or direct, sell, assign or transfer any such opportunity to any Person other than the Company or the Members; provided such opportunity is located outside of the WGU Project Area.

(h)     Each of the Company and the Members hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against any Manager Affiliates for or in connection with any such investment activity or other transaction activity or other matters described in Sections 5.5(f), Section 5.5(g) and/or Section 5.5(h) *[Duties and Obligations of a Manager; Member Knowledge of Oil and Gas Business]*, whether arising in common law or equity or created by rule of law, statute, constitution, contract or otherwise, are expressly released and waived by the Company and each Member, in each case to the fullest extent permitted by law.

(i)     Notwithstanding anything in this Agreement to the contrary, each of the Company and the Members acknowledge and agree that the Manager Affiliates have obtained, prior to the date hereof, and are expected to obtain, on and after the date hereof,

confidential information from other Persons in connection with the activities and transactions described in Section 5.5(f), Section 5.5(g) and/or Section 5.5(h) *[Duties and Obligations of a Manager; Member Knowledge of Oil and Gas Business]* or otherwise. Each of the Company and the Members hereby agrees that (i) none of the Manager Affiliates has any obligation to use any such confidential information in connection with the business, operations, management or other activities of the Company or to furnish to the Company or any Member any such confidential information, and (ii) that any claims against, actions, rights to sue, other remedies or other recourse to or against such Persons for or in connection with any such failure to use or to furnish such confidential information, whether arising in common law or equity or created by rule of law, statute, constitution, contract or otherwise, are expressly released and waived by the Company and each Member, to the fullest extent permitted by law.

(j)     Notwithstanding anything to the contrary contained in this Agreement, the Members specifically acknowledge and agree that the Manager shall have the full power and authority to cause the Company to enter into agreements, pay compensation and other consideration to the Manager, the Manager's Affiliates and/or any other Persons whatsoever, on such terms and conditions as the Manager, in the Manager's sole discretion, shall determine, subject only to the restriction on payment of a management fee to the Manager for its services as Manager of the Company under Section 5.8 *[Management Fee; Reimbursement]* hereof, which requires approval of a Majority of the Members. The Members expressly acknowledge that several Manager Affiliates may provide services to the Company and shall be paid for such services as determined by the Manager, including but not limited to (i) Twisted Oak Operating, LLC as the intended designated Operator of the WGU Project in accordance with the Joint Operating Agreement, (ii) Black Oak Partners, LLC who will provide accounting services to the Company, and (iii) Black Oak Energy, LLC which will provide drilling, completion and supervisory services for the field operations of the Company. It is not expected that BTE will be paid a management fee for its services in its capacity as Manager hereunder unless any such payment is approved by a Majority of the Members as provided in Section 5.8 *[Management Fee; Reimbursement]*.

(k)     Each Member represents that such Member is a sophisticated investor in commercial investments, and that such Member has sufficient knowledge of the oil and gas business to evaluate the risks associated with an investment in such business and in the Company. Each Member represents that such Member has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in their investment in the Company. Each Member understands that, in reliance upon applicable exemptions from registration, the Units have not been, and will not be, registered under the Securities Act of 1933 or any state securities law.

**5.6     Officers**.  The Company may have such officers as may be designated by the Manager from time to time. No officer need be a resident of the State of Oklahoma. Any such officers so designated shall have such authority and perform such duties as are specified by the Manager. If the title of an officer is one commonly used for officers of a business corporation formed under the Oklahoma General Corporation Act (or any successor statute), the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to the overall authority of the Manager. Each officer

shall hold office until a successor shall be duly designated and shall qualify or until such officer's death or resignation or until such officer shall have been removed by the Manager.  Any number of offices may be held by the same person.

5.7  **Indemnification of the Manager and Manager Team**.

(a)  The Company (and/or the Company's receiver or trustee) shall indemnify, save harmless and pay all judgments and claims against the Manager and the Manager Affiliates (the Manager and such other Persons or affiliates being hereinafter referred to as the "Manager Team") relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any of the Manager Team in connection with the business of the Company, including attorneys' fees and costs incurred by any of the Manager Team in connection with the defense of any action based on any such act or omission, which attorneys' fees and costs shall be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law.

(b)  The Company shall indemnify, save harmless and pay all expenses, cost or liabilities of any of the Manager Team who, for the benefit of the Company, makes any deposit, acquires any option or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and who suffers any financial loss as the result of such action.

(c)  Notwithstanding the provisions of Section 5.7(a) and Section 5.7(b) *[Indemnification of the Manager and Manager Team]* above, the Manager shall not be indemnified from any breach of any of the Manager's obligations, duties or undertakings hereunder (to the extent asserted by any Member against the Manager), and none of the Manager Team shall be indemnified from any liability, resulting from such Person's fraud, bad faith, willful misconduct or gross negligence.

5.8  **Management Fee; Reimbursement**.  Unless approved by a Majority of the Members, no management fee shall be paid to the Manager. Notwithstanding the foregoing, the Company shall reimburse the Manager for reasonable expenses directly incurred for or on behalf of the Company, including costs of any administrative proceedings or litigation and costs paid to lawyers, accountants, landmen, contractors, other professionals or third parties incurred for or on behalf of the Company in connection with the WGU Project. The Company will also reimburse the Manager for all organizational and offering expenses and other administrative expenses incurred on behalf of the Company, including all out-of-pocket expenses incurred in connection with the organization and formation of the Company and the offering of the Units, including, without limitation, legal and accounting fees and expenses; printing costs; state securities filing fees; organizational fees and other expenses incurred in connection with this offering, as well as professional fees associated with the establishment of the unit.

5.9  **Action by Written Consent**.  Any action required or permitted to be taken by the Members hereunder may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum Unit Percentage necessary to authorize or take such action.

## ARTICLE 6
## BOOKS AND RECORDS

**6.1** **Books and Records**. The Manager, on behalf of the Company, shall keep appropriate books and records at the Company's place of business, setting forth a true, complete and accurate account of all business transactions arising out of and in connection with the conduct of business by the Company. Any Member or his designated representative shall have the right, at any reasonable time, to have access to and inspect and copy, at such Member's expense, the contents of such books and records. The accounts, books and records of the Company will be maintained in accordance with prudent and sound accounting practices consistently applied which fairly and accurately reflect in all material respects the character and amount of the accounts and financial condition of the Company, including, without limitation, the equity, assets, liabilities, Profits, and Losses of the Company.

**6.2** **Annual Reports**. The Company's fiscal, taxable and/or accounting year shall be the calendar year. Within a reasonable period after the end of each Company fiscal year, the Manager shall furnish the Members with an annual report containing a balance sheet as of the end of such fiscal year and statements of income, Members' equity, and changes in financial position and a cash flow statement for the year then ended. Periodically, at such times and places which are acceptable to the Members, the Manager shall meet with the Members to update the Members with respect to the Company's financial condition and status of prospects and projects.

**6.3** **Tax Information**. Necessary tax information shall be delivered to each Member after the end of each fiscal year of the Company. Commercially reasonable efforts shall be made by the Manager to furnish such information within one hundred eighty (180) days after the end of each fiscal year.

**6.4** **Partnership Representative**. BTE shall have exclusive authority to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and the Members, and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Company and the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members. BTE is specifically authorized to act as the "Partnership Representative" of the Company pursuant to Regulations §301.6223-1, and Dawnetta Taylor is appointed to act as the "Designated Individual" of the Partnership Representative, as such terms are defined under the Code, and BTE and Dawnetta Taylor are authorized and appointed to act in any similar capacity under state or local law. The Company (and/or the Company's receiver or trustee) shall indemnify, save harmless and pay all judgments and claims against BTE, the Designated Individual, Black Oak Energy Holdings, LLC and any other Persons of the Manager Team, relating to any liability or damage incurred by reason of any act performed or omitted to be performed by them in connection with carrying out BTE's duties and authority set forth herein, including attorneys' fees and costs incurred by any of the Manager Team in connection with the defense of any action based on any such act or omission, which attorneys' fees and costs shall be paid as incurred. Notwithstanding the foregoing, neither the Partnership Representative, the Designated Individual nor any other Person of the Manager Team shall be indemnified from any liability resulting from such Person's fraud, bad faith, willful misconduct or gross negligence.

**6.5** **Bank Accounts**. All funds of the Company will be deposited in its name in an account or accounts maintained at a federally insured national or state bank designated by the Manager. Checks will be drawn upon the Company and will be signed by Persons designated by the Manager. Funds of this Company will not be commingled with the funds of any other Person.

**ARTICLE 7**
**TRANSFER OF UNITS**

**7.1** **In General**.

(a) Except as authorized pursuant to Section 7.2 *[Permitted Transfers]* or in accordance with the procedures set forth in Section 7.3 *[ROFR]*, no Member shall have the right to withdraw from the Company or Transfer all or any portion of such Member's Units. Any Transfer by a Member which does not comply with the provisions of this ARTICLE 7 *[Transfer of Units]* shall be null and void and shall not cause or constitute a dissolution of the Company. No such Transfer shall be recorded on the Company's books and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(b) If for any reason any such Transfer is not null and void, then the transferee shall not be a Substitute Member, and shall have no right to participate in the Company's affairs as a Member of the Company, but instead shall be entitled to receive only the share of profits or other compensation by way of income and the return of contributions to which the transferring Member would otherwise be entitled at the time such transferring Member would be entitled to receive the same.

**7.2** **Permitted Transfers**. The provisions of Section 7.1 *[In General]* and Section 7.3 *[ROFR]* shall not apply to any Transfer by any Member of all or any portion of its Units to any of the following:

(a) Any Affiliate of such Member; or

(b) With respect to any Member that is a natural Person, a trust under which the Member is the sole trustee and the trust beneficiaries are limited to the Member, such Member's spouse, descendants (including adoptive relationships and stepchildren) and the spouses of each such descendant.

**7.3** **ROFR**.

(a) If any one or more Members (each a "Transferor") receives a *bona fide* offer (an "Offer") and wishes to Transfer such Transferor's Units pursuant to the terms of such Offer, the Transferor must provide written notice (the "Transfer Notice") to the Manager and the other Members (the "Non-Transferring Members") of its desire to Transfer its Units pursuant to the terms of the Offer.

(i) The Transfer Notice shall include full information concerning the Offer, including a copy of all relevant documentation relating to such Offer, the

name and address of the Person to whom the Units are proposed to be transferred (who must be ready, willing and able to acquire the Units in accordance with the terms stated in the Transfer Notice), the financial arrangements relating to the proposed transfer, the number of Units proposed to be acquired by the proposed transferee (the "Offered Units"), the purchase price per Unit and all other terms of the Offer (including a true and correct copy of the documentation by which the Offer has been made).

(ii)     By delivering the Transfer Notice, the Transferor represents and warrants to the Manager and each Member that: (A) the Transferor has full right, title, and interest in and to the Offered Units; (B) the Transferor has all the necessary power and authority and has taken all necessary action to Transfer such Offered Units as contemplated by this Section 7.3 *[ROFR]*; and (C) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(b)     The Non-Transferring Members shall have the right and option (the "ROFR Option") to purchase all, but not less than all, of the Offered Units on the same terms and conditions as stated in the Transfer Notice.

(i)     In order to exercise the ROFR Option, the Non-Transferring Members must give written notice to the Transferor and the Manager of the exercise of the ROFR Option, stating the number of Units the Non-Transferring Member elects irrevocably to purchase on the terms set forth in the Transfer Notice, within thirty (30) days following the date the Transfer Notice is received by the Non-Transferring Members (the "ROFR Option Period").

(ii)     If the Members exercising the ROFR Option shall have indicated an intent to purchase more than the total number of Offered Units, then the exercising Members shall be allocated their pro rata share of the Offered Units based on their relative Unit Percentages, unless otherwise agreed by such Members.

(iii)     If the Non-Transferring Members, collectively, do not timely exercise the ROFR Option to purchase all the Offered Units, then the Transferor may transfer all of the Offered Units to the prospective purchaser in accordance with the terms contained in the Offer, provided that (A) such Transfer is consummated within 60 days following the expiration of the ROFR Option Period, and (B) the transferee of such Units, as a condition precedent to consummation of such Transfer, delivers to the Company a written agreement to be bound by all of the terms and provisions of this Agreement and any other documents as the Manager may reasonably request. After consummation of a Transfer pursuant to this Section 7.3 *[ROFR]* to a transferee who is not an existing Member of the Company, such transferee shall have only those rights specified in Section 7.1(b) *[In General]*, and shall be admitted as a Substitute Member only upon full compliance with Section 7.5 *[Admission as a Substitute Member]*. If at the end of such 60-day period the Transferor has not completed the Transfer pursuant to the Offer, the Transferor may not then Transfer any of the Offered Units under this

Section 7.3 *[ROFR]* without again fully complying with the provisions of this Section 7.3 *[ROFR]*.

**7.4**     **Transferred Units**.  If any Units are Transferred during any accounting period in compliance with the provisions of this ARTICLE 7 *[Transfer of Units]*, Profits, Losses, each item thereof and all other items attributable to such Units for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with § 706(d) of the Code, using any conventions permitted by law and reasonably selected by the Manager.  All distributions on or before the date of such transfer shall be made to the transferor and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Units were Transferred and such other information as the Manager may reasonably require within thirty (30) days after the end of the accounting period during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, on the last day of the accounting period during which the Transfer occurs, was the owner of such Units.  Neither the Company nor the Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 7.4 *[Transferred Units]*, whether or not the Manager or the Company has knowledge of any Transfer of ownership of any Units.

**7.5**     **Admission as a Substitute Member**.

    (a)     Upon a Transfer by a Member of all or part of its Units in accordance with Section 7.2 *[Permitted Transfers]* (but not otherwise), the transferee shall automatically become a Substitute Member with respect to the Units acquired upon (i) execution by the transferee of a joinder agreement in form approved by the Manager binding the transferee as a party to this Agreement, and (ii) payment of all costs and expenses (including legal fees) incurred by the Company in connection with the Transfer.

    (b)     Upon a Transfer by a Member of all or part of its Units in accordance with Section 7.3 *[ROFR]*, if the transferee is not an existing Member of the Company, the transferee shall only become a Substitute Member with respect to the Units acquired upon (i) execution by the transferee of a joinder agreement in form approved by the Manager binding the transferee as a party to this Agreement, (ii) payment of all costs and expenses (including legal fees) incurred by the Company in connection with the Transfer, and (iii) the approval of such substitution by the Manager, which approval must be in writing and may be granted or withheld by the Manager in its sole and absolute discretion.

    (c)     Any Member who Transfers all of its Units shall cease to be a Member of the Company and shall have no further rights as a Member in or with respect to the Company (whether or not the transferee of such former Member is admitted to the Company as a Substitute Member).

**7.6**     **Transfer Restrictions**.  Notwithstanding anything to the contrary herein, no Transfer shall be made if it would (i) violate applicable federal and state securities laws or rules

and regulations of the Securities and Exchange Commission, any state securities commission or any other governmental authority with jurisdiction over the Transfer, or (ii) affect the Company's qualification as a limited liability company under the Act.

## ARTICLE 8
## DISQUALIFICATION OF A MEMBER; DISSOLUTION AND WINDING UP

**8.1** **Disqualification of a Member**. Upon (i) the withdrawal, bankruptcy or dissolution of an Investor Member, (ii) any purported Transfer of all or any part of an Investor Member's Units in a manner not expressly permitted by this Agreement, (iii) any material breach of this Agreement by an Investor Member (other than failure to make a required Capital Contribution, the remedies for which are governed by Section 2.3(b)) that is not cured within 30 days after the Manager gives written notice of such breach to the Investor Member, or (iv) the occurrence of any other event which terminates the continued existence of an Investor Member in the Company other than the death or disability of the Investor Member (in each instance, the affected Investor Member being a "Disqualified Member"), the Disqualified Member (or such Disqualified Member's successor in interest) shall thereafter be treated as an assignee of a limited liability company membership interest and shall have no right to participate in the Company's affairs as a Member of the Company (including voting on any matter before the Members or Manager of the Company) and shall be afforded only such rights to which such an assignee is entitled under the Act. The remaining Members will have the continuing option to purchase the Disqualified Member's Units at a purchase price equal to 10% of the Capital Contributions actually paid into the Company by the Disqualified Member. Any Member desiring to exercise the purchase option provided in this Section 8.1 *[Disqualification of a Member]* must deliver written notice to the Disqualified Member and all other Members. Any other Members desiring to participate in the purchase of the Disqualified Member's Units shall have 30 days from receipt of such notice to notify the exercising Member and the Manager thereof. Unless otherwise agreed among the purchasing Members, the purchasing Members shall acquire the Disqualified Member's Units pro rata in accordance with the relative Unit Percentages of the purchasing Members.

**8.2** **Dissolution**. The Company shall dissolve upon the first to occur of any of the following events.

      (a)    The sale of all or substantially all of the Company Property;

      (b)    The election by the Manager to dissolve the Company; or

      (c)    The entry of a decree of dissolution under Section 2038 of the Act.

The bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Member will not cause the termination or dissolution of the Company, and the business of the Company will continue.

**8.3** **Winding Up**. Upon a dissolution of the Company, the Manager (or court-appointed trustee if there be no Manager) shall take full account of the Company's liabilities and Company Property. The Company Property shall be liquidated and the proceeds therefrom and any remaining Company Property not so liquidated shall be applied and distributed in the following order:

(a)     To the payment and discharge of all of the Company's debts and liabilities (other than those to the Members), including the establishment of any necessary reserves;

(b)     To the payment of any debts and liabilities of the Company to the Members;

(c)     To the Members in accordance with the Members' positive balances in their Capital Accounts after giving effect to all contributions, distributions and allocations for all periods, specifically including without limitation, any special and regulatory allocations;

(d)     The balance, if any, to the Members in accordance with their Unit Percentages.

If the Manager reasonably determines it appropriate, the Manager will proceed, as promptly as practicable in a prudent manner and without undue sacrifice, to liquidate and sell all Company Property for the best prices obtainable in the reasonable judgment of the Manager. In making sales of Company Property, the Manager shall have full right and discretion to determine the time, manner and terms of any sale or sales of Company Property pursuant to such liquidation, having due regard to the activity and condition of the relevant market and general financial and economic conditions; provided that no sale to a Member or any Affiliate of a Member shall be made in any event unless the same is approved in writing by a Majority of the Members. If the Manager reasonably determines that liquidation and sale of the Company Properties is not appropriate, the Manager will endeavor, to the extent feasible in the good faith judgment of the Manager, to avoid sale of the Company Property and, instead, will sell only such part (if any) of the Company Property as shall be necessary in the Manager's judgment to pay debts and obligations of the Company. All remaining assets of the Company shall be distributed, in kind, to the Members in accordance with their then current respective Unit Percentages.

**8.4     Compliance with Timing Requirements of Regulations; Deficit Capital Accounts**. In the event the Company is "liquidated" within the meaning of Regulations § 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this ARTICLE 8 *[Disqualification of a Member; Dissolution and Winding Up]* first to the Members in accordance with their positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2) and then pro-rata based upon their Unit Percentages. If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

**8.5     Reserve**. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to ARTICLE 8 *[Disqualification of a Member; Dissolution and Winding Up]* may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

**8.6**    **Liquidating Trust**.  In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to the preceding sentence may be distributed to a trust established for the benefit of the Members for the purpose of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to Members pursuant to this Agreement.

**ARTICLE 9**
**DISPUTE RESOLUTION**

**9.1**    **Mediation; Submission Requirement**.  If a dispute among the Members arising out of or relating to any subject matter of this Agreement or the ownership, management and/or operation of the Company is not resolved through good faith consultation between the parties, the parties agree first to try in good faith to settle the dispute by non-binding mediation administered by the American Arbitration Association (the "AAA") under its Commercial Mediation Rules. The mediation shall be held in Oklahoma City, Oklahoma, unless otherwise agreed by the parties. Upon delivery to the AAA of a notice describing the nature of the claim and the provisions of this Agreement which are the basis of the dispute, the claim shall be deemed to have been submitted to mediation.

**9.2**    **Mediation**.  The parties agree to the selection of a single mediator to participate in mediation of the dispute.  If the parties are unable to agree upon a single mediator then the AAA shall appoint a single mediator.  Each party shall pay its own costs and expenses incurred in connection with mediation and the parties shall share equally in all costs and expenses associated with the mediator.  Each party may be represented at the mediation by its counsel, and each party shall have present at the mediation one or more representatives with authority to bind the party to any resolution that may be mediated.

**9.3**    **Arbitration; Submission Requirement**.  In the event that mediation does not resolve the dispute, such dispute shall be settled by binding arbitration administered by the AAA under its Commercial Arbitration Rules.  The arbitration shall be held in Oklahoma City, Oklahoma, unless otherwise agreed by the parties.  Upon delivery to the AAA of a notice describing the nature of the claim and the provisions of this Agreement which are the basis of the dispute, the claim shall be deemed to have been submitted to arbitration.

**9.4**    **Arbitration Proceeding**.  The arbitration hearing shall be held before three AAA panel arbitrators.  The parties shall share equally in the costs and expenses associated with the arbitrators, unless the arbitrators award costs, including attorneys' fees, to the party receiving a monetary or other affirmative award.  The arbitration proceeding shall be held at a time and place selected by agreement of the parties or, in the absence of such agreement, at the time and place selected by a majority of the arbitrators.  In the arbitration proceeding, each party shall be permitted to obtain discovery before the final hearing that includes, at a minimum, (1) three depositions of fact witnesses and depositions of all experts, (2) responses to written discovery requests, and (3) voluntary disclosure of all fact witnesses having personal knowledge of relevant facts.  It is the

parties' intent to limit discovery to the parameters set forth above unless they later agree in writing to permit additional discovery or the AAA panel Members determine upon hearing that some additional discovery is warranted.

**9.5**     **Binding Decision**.  The decision of the arbitrators is binding on the parties, and following completion of the arbitration a party may not institute litigation to reverse the decision of the arbitrators.   A party may, however, institute litigation to enforce the decision of the arbitration.  Once a claim is submitted to arbitration, neither party may institute litigation regarding the claim, except to enforce that arbitration decision.

## ARTICLE 10
## MISCELLANEOUS

**10.1**     **Notices**.  All notices, requests, demands, payments and other communications hereunder shall be in writing and shall be deemed to have been sufficiently given or made when personally delivered, when delivered via email, or when deposited in the United States mail, certified mail, return receipt requested, with sufficient postage thereon, addressed, if to a Member, as set forth on the signature page of such Member, or, if to the Company or to the Manager, addressed as follows:

<u>If to the Company
or the Manager:</u>          BTE Energy, LLC
                             700 N.W. 5ᵗʰ Street
                             Oklahoma City, Oklahoma 73102
                             Attention: Mr. Jim Allen
                             Email: jim@twistedoakoperating.com

or to such other address as the parties shall designate in a notice given in accordance with the provisions of this Section.

**10.2**     **Binding Effect**.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, permitted transferees and permitted assigns.  This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof, including, without limitation, the governance, management and operation of the Company.   This Agreement supersedes all prior and contemporaneous   negotiations,   proposals,   communications,   understandings,   agreements, representations and warranties, either verbal or in writing, between the parties relating to the Company.

**10.3**     **Construction**.  Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

**10.4**     **Headings**.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.  All references made in this Agreement to a

Section or an Article are to the applicable Section or Article in this Agreement, unless the context clearly indicates otherwise.

**10.5    Severability**.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**10.6    Additional Documents**.  Each Member, upon the request of the Manager or any other Member, agrees to perform all further reasonable acts and to execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

**10.7    Governing Law**.  This Agreement shall be construed in accordance with, and the rights and duties of the parties hereto shall be governed by, the internal laws of the State of Oklahoma applicable to a contract executed and performed in such State, without giving effect to conflicts of laws principles requiring the application of the law of another State.

**10.8    Waiver of Action for Partition**.  Each of the Members irrevocably waives any right that such Member may have to maintain any action for involuntary dissolution of the Company or partition with respect to any of the Company Property.

**10.9    Attorneys' Fees**.  Subject to ARTICLE 9 *[Dispute Resolution]* above, if any action, suit or other proceeding (including an arbitration proceeding under ARTICLE 9 *[Dispute Resolution]*) is brought to construe or enforce, or for the breach of, this Agreement, the prevailing party therein shall be awarded its costs and expenses (including reasonable attorneys' fees).

**10.10   Equitable Remedies**.  The parties hereto declare that it is impossible to measure in money the damages which may accrue to a party hereto or to the estate or personal representative of a decedent, by reason of a failure of a party to perform any of the obligations of this Agreement. Therefore, if any party hereto or the personal representative of a decedent shall institute any action or proceeding to enforce the provisions hereof, any other party against whom such action or proceeding is brought hereby waives any right such party may have to make the claim or defense therein that such party or such personal representative has an adequate remedy at law.  The parties further agree that the equitable remedy of specific performance shall be available to enforce the terms of this Agreement.

**10.11   Expenses**.  All expenses incurred by the Manager in connection with the formation of the Company and the negotiation and preparation of this Agreement shall be paid by the Company.  In all other respects, each party will bear its own expenses of negotiating and preparing this Agreement.

**10.12   Amendment**.  No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Manager and a Majority of the Members. Any such written amendment or modification will be binding upon the Company and each Member; provided, that (i) an amendment or modification modifying the rights or obligations of any Member in a manner that is disproportionately adverse to such Member relative to the rights of other Members in respect of Units of the same class or series shall be effective only with the consent of a majority in interest of the Members who are affected in such manner; and (ii) any

amendment or modification of this Section 10.12 *[Amendment]* shall require the approval of all Members. Notwithstanding the foregoing, the Manager may, without the consent of or execution by the Members, amend or modify this Agreement to effect changes of an administrative or ministerial nature, to cure ambiguities or inconsistencies in this Agreement, or to reflect any new authorization, issuance, redemption, repurchase, or transfer of Units or other admission or withdrawal of a Member in accordance with this Agreement.

    **10.13**  **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original for all purposes.

    **10.14**  **Defined Terms**.  Certain defined terms used in this Agreement are defined in Section 1.8 *[Definitions]* and shall have the meanings provided for those terms in Section 1.8 *[Definitions]*. Each term used elsewhere in this Agreement for which a stated meaning is provided or that is enclosed by quotations and in parentheses is a defined term and shall have the meaning provided in this Agreement for that term. Each term that is defined in this Agreement in the singular shall include the plural of such term and each term that is defined in this Agreement in the plural shall include the singular of such term, as the context indicates.

    **10.15**  **Confidentiality**.  Except as required by law, each Member agrees that such Member shall keep confidential and shall not disclose or divulge any confidential, proprietary, or secret information relating to the Company and/or any Company Property (including, without limitation, Company data, information, maps and records relating to such matters as the Company leases, geological, geophysical or seismic data, production information, confidential reports, and financial information); provided, that a Member may disclose such information (i) to such Member's attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with this Agreement and the transactions contemplated by this Agreement, (ii) to any prospective purchaser of any interest in the Company as long as such prospective purchaser agrees in writing to be bound by the provisions of this Section 10.15 *[Confidentiality]*, (iii) as required by law, rule (including any stock exchange rule), regulation, or legal process (provided, however, that to the extent practicable, such party shall give prompt written notice of any such request for such information to the Manager, and agrees to cooperate with the Manager, to the extent permissible and practicable, to challenge the request or limited the scope thereof, as the Manager may reasonably deem appropriate**).**

*[Signatures on following page]*